**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

|  |  |
|---|---|
| ANTHONY SIRIANI; JOSEPH ANTONAKOS; GRACE CICCONE as Executrix of the Estate of Dr. Patrick Ciccone; KATE FAUNTLEROY; PERRY HARRIS; LEROY HOWE; DAVID KNOX; RICHARD KRAMER; DR. GREGORY LOVALLO; WILLIAM JOSEPH MORONEY as Trustee of the WJM Trust; DR. ROBERT SIMON; DR. VINCENT LANTERI; DR. MICHAEL J. WASSERMAN; and LORI SIRIANI on behalf of themselves individually and all other similarly situated, and derivatively on behalf of the L3 CAPITAL INCOME FUND, LLC, a Delaware limited liability company; ANTHONY SIRIANI; GRACE CICCONE as Executrix of the Estate of Dr. Patrick Ciccone; PERRY HARRIS; LEROY HOWE; DAVID KNOX; RICHARD KRAMER; DR. GREGORY LOVALLO; WILLIAM JOSEPH MORONEY as Trustee of the WJM Trust; DR. VINCENT LANTERI; DR. MICHAEL J. WASSERMAN; and LORI SIRIANI on behalf of themselves individually and all other similarly situated, and derivatively on behalf of the L3 CAPITAL HOTEL FUND, LLC, a Delaware limited liability company; ANTHONY SIRIANI; GRACE CICCONE as Executrix of the Estate of Dr. Patrick Ciccone; PERRY HARRIS; LEROY  HOWE; WILLIAM JOSEPH MORONEY as Trustee of the WJM Trust; and LORI SIRIANI on behalf of themselves individually and all other similarly situated, and derivatively on behalf of the L3 CAPITAL SPECIAL OPPORTUNITY FUND, LLC, a Delaware series limited liability company, <br><br> Plaintiffs, <br> v. <br><br> DAVID FEINGOLD; FEINGOLD, LLC; DAVICK CAPITAL, LLC; FEINGOLD MORGAN SANCHEZ, LLC; MCA VENTURE I LLC; E CONSULTING GLOBAL GROUP, LLC; MICHAEL | **CASE NO.  1:25-cv-22608** |

DAZZO; DZ SQUARED, LLC; AMERITECH GLOBAL VENTURES, LLC; RICHARD CARDINALE; L3 CAPITAL MANAGEMENT, LLC; L3 CAPITAL ADVISORS, LLC; RVCSI, LLC; JOSEPH BALDASSARRA; STEVEN BALDASSARRA; JDS PARTNERS; BROAD STREET, INC.; BROAD STREET GLOBAL HOLDINGS, LLC; BROAD STREET GLOBAL MANAGEMENT, LLC; BROAD STREET GLOBAL FUND, LLC; and BROAD STREET NEW YORK, INC.,

Defendants.

and

L3 CAPITAL INCOME FUND, LLC, a Delaware limited liability company; L3 CAPITAL HOTEL FUND, LLC, a Delaware limited liability company; and L3 CAPITAL SPECIAL OPPORTUNITY FUND, LLC, a Delaware series limited liability company,

Nominal Defendants.

## VERIFIED DERIVATIVE COMPLAINT
(JURY TRIAL DEMANDED)

The above-named Plaintiffs, which include numerous individual investors/members filing derivatively on behalf of three private equity funds (the "**L3 Funds**")[1] hereby file the following Verified Derivative Complaint against the above-named Defendants. Plaintiffs allege the following based upon information and belief, except as to those allegations concerning the Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and under the supervision of their counsel which include, among other things: (a) a review and analysis of the bank account

---

[1] The "**L3 Funds**" are collectively (i) L3 Capital Income Fund, LLC, (ii) L3 Capital Hotel Fund, LLC, and (iii) L3 Special Opportunity Fund, LLC.

2

statements for the L3 Capital Income Fund, Alternative Global Management and Alternative Global 1 through 6; (b) a review and analysis of records purporting to reflect the performance of the L3 Funds' investments in Samson, a merchant cash advance (MCA) business; and (c) complaints and related materials in litigation commenced by or against some or all of the Defendants.

All the Plaintiffs were members of one or more of the L3 Funds at the time of the transactions complained of, or the Plaintiffs' membership later devolved on it by operation of law. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack. The Plaintiffs have spent the past six months working with the manager of the L3 Funds to get him to file this action for the L3 Funds, but this action implicates the manager's own wrongdoing, and thus this action must be brought derivatively on behalf of the members of the L3 Funds.

**PRELIMINARY STATEMENT**

1.      This is a derivative action brought for the benefit of L3 Capital Income Fund, LLC, L3 Capital Hotel Fund, LLC and L3 Special Opportunity Fund, LLC.  Plaintiffs are members of the L3 Funds.  The L3 Funds are private equity funds that purportedly raised money from investors to invest in various investments including but not limited to merchant cash advance ("MCA") portfolios, land infrastructure projects, debt settlement businesses, restaurants, home developments, four hotels, and two specific outparcels of land for commercial real estate development.

2.      Plaintiffs seek recovery of more than *$150 million of investor funds and assets* that Defendants have stolen, hijacked, diverted, commingled, and/or wrongfully hidden through an ongoing conspiracy of fraudulent, deceptive, and unfair acts masterminded by defendant David Feingold ("**Feingold**"), a Florida businessman and Florida-licensed attorney.   Feingold

orchestrated an excessively complicated investment structure and ongoing deceptive scheme to allow himself and his co-conspirators – including Michael Dazzo ("**Dazzo**"), Richard Cardinale ("**Cardinale**"), Joseph    Baldassarra ("**J. Baldassarra**"), and Steven Baldassarra ("**S. Baldassarra**")[2] – to improperly seize control over investor funds and assets, line their own pockets with tens-of-millions of dollars, and unjustly enrich themselves and entities they own and control, including "**Broadstreet**."[3]

3.       The Securities and Exchange Commission ("**SEC**") recently brought a securities fraud enforcement action against Feingold, the Baldassarra Brothers, and two Broadstreet Entities, alleging they defrauded Broadstreet investors to the tune of over $1 Billion.[4]  Alarmingly, many of the same projects that Plaintiffs invested in through the L3 Funds (the "**L3 Investments**")[5] have surfaced in the SEC Enforcement Action as supposed Broadstreet investments.  However, it appears Feingold and his co-conspirators improperly diverted L3 Investments and assets to Broadstreet and other entities that Feingold owns and controls, all while pocketing ten-of-millions of dollars of illicit proceeds along the way.  And, even though Feingold, Dazzo, the Baldassara

---

[2] The "**Individual Defendants**" are collectively (i) Feingold, (ii) Dazzo, (iii) Cardinale, (iv) J. Baldassarra, and (v) S. Baldassarra.  J. Baldassarra and S. Baldassarra are sometimes collectively referred to as the "**Baldassarras**" or "**Baldassarra Brothers.**"

[3] The "**Broadstreet Entities**" or "**Broadstreet**" refers collectively to (i) Broad Street, Inc. ("**BSI**"), (ii) Broad Street Global Holdings, LLC ("**BSGH**"), Broad Street Global Management, LLC ("**BSG Management**"), Broad Street Global Fund, LLC, (the "**Broadstreet Fund**" or "**BSG Fund**"), and Broadstreet New York, Inc. ("**BSNY**").  Note that Broadstreet documentation varies as to whether there is a space ("Broad Street") or no space ("Broadstreet") or a capital "S" ("Broadstreet").  Unless otherwise noted, all variations are intended to be included in this definition without limitation.

[4] *SEC v. Feingold et al.*, No. 1:25-cv-20436-DPG (S.D. Fla.). **Exhibit A** ("**SEC Enforcement Action**").

[5] The "**L3 Investments**" include, but are not limited to, merchant cash advance ("MCA") portfolios, land infrastructure projects, debt settlement businesses, restaurants, home developments, four hotels, and two specific outparcels of land for commercial real estate development, as explained in more detail below.

Brothers, and the Broadstreet Entities have absolutely no rights whatsoever to own, manage or control any of the L3 Investments, they have admitted that is exactly what they are doing *to this day,* including at least seven (7) land infrastructure projects, four (4) hotels, and two (2) outparcel commercial real estate development projects, all currently potentially worth hundreds of millions of dollars that ultimately belong to L3 investors, not Broadstreet or any of the Defendants.

4.      Dozens of investors have objected to Feingold's, Dazzo's, and Broadstreet's misappropriation and ongoing involvement *in writing*, but these Defendants still refuse to relinquish control over the L3 Investments, much less give L3 investors their money back or "make them whole" as Feingold and Broadstreet falsely promised they would do.  Instead, the Defendants lie to investors, threaten them, and even sue them if they dare to ask questions or seek recovery on their L3 Investments that have been hijacked by Broadstreet.

5.      Plaintiffs seek: (i) the return of misappropriated funds and assets; (ii) receipt of realized gains and profits to which the L3 Funds are entitled; (iii) a declaration that the L3 Funds are entitled to receipt of future gains and profits secured through the L3 Funds' investments on a going-forward basis; (iv) injunctive relief preventing Defendants from interfering with the L3 Funds' rights, including their rights to manage and control their own affairs and to enjoy the fruits of their investments; (v) attorneys' fees where provided for by contract and statute; and (vi) when they are granted leave to do so, punitive damages against Defendants based on their outrageous conduct arising from their theft and diversion of hundreds of millions of dollars from innocent investors.

## JURISDICTION AND VENUE

6.      This is an action for damages under Section 10(b) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78j and Rule 10b-5, codified at 17 C.F.R. section 240.10b-5; and pursuant to 18 U.S.C. § 1964 (the "Racketeer Influenced and Corrupt Organizations Act" or "RICO").  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and the principles of ancillary or supplemental jurisdiction under Title 28, United States Code, Section 1367.

7.      This Court has personal jurisdiction over Defendants because they, themselves or through operation and control of certain entities, operated, conducted, engaged in and carried on a fraudulent business and scheme in the Southern District of Florida.

8.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391, 15 U.S.C. §78aa, and 18 U.S.C. § 1965 because Defendants' wrongful acts described herein occurred in the Southern District of Florida.  Additionally, the Defendants are residents of, and/or transact business in, Miami-Dade County, Florida.

9.      Any conditions precedent to bringing this action have occurred or been excused, or the satisfaction of such conditions would be futile.

10.     Plaintiffs have retained the undersigned counsel to prosecute this action and are obligated to pay reasonable attorneys' fees and costs in connection with this action.

## NOMINAL DEFENDANTS

11.     Nominal Defendant L3 Capital Income Fund, LLC ("**L3 Income Fund**") is a limited liability company organized and operating under the laws of Delaware.  The L3 Income Fund is a private equity fund.  Approximately one-hundred individual investors are Members of the L3 Income Fund and include citizens of Florida, New York, New Jersey, Oregon, Connecticut,

6

Arizona, Texas, and South Carolina, among other states. The L3 Income Fund's Original and Amended Private Placement Memoranda ("PPM"), Operating Agreements and Subscription Agreements are attached as **Composite Exhibits B and C**.

12.     Nominal Defendant L3 Capital Hotel Fund, LLC ("**L3 Hotel Fund**") is a limited liability company organized and operating under the laws of Delaware. The L3 Hotel Fund is a multi-series private equity fund. The Hotel Fund's members include citizens of Florida, New York, New Jersey, Pennsylvania, Oregon, Connecticut, Arizona, Texas, and South Carolina, among other states. The Hotel Fund includes four separate investment series: (a) Asheville Hotel Project; (b) Raleigh Hotel Project; (c) North Myrtle Beach Hotel Project; and (d) Ormond Beach Hotel Project. The Hotel Fund's Private Placement Memorandum ("PPM") and LLC Agreement are attached as **Composite Exhibit D**.

13.     Nominal Defendant L3 Capital Special Opportunity Fund ("**L3 Special Op. Fund**") is a limited liability company organized and operating under the laws of Delaware. The L3 Special Op. Fund is a private equity fund. The Special Opportunity Fund's members include citizens of Florida, New York, New Jersey, Pennsylvania, and Texas among other states. The Special Opportunity Fund PPM, LLC Agreement, and Subscription Agreement are attached as **Composite Exhibit E**.

## PLAINTIFFS

14.     Plaintiffs are investors who – between June 2019 and October 2021 – became members of the L3 Funds by investing in one or more of the L3 Funds as follows (collectively the "**L3 Investors**"):

    a.   Plaintiff ANTHONY SIRIANI ("**Mr. Siriani**") is 80 years old. He is a citizen and resident of Florida. Mr. Siriani invested:

        •  $570,000 in the L3 Income Fund,

- $200,000 in the L3 Hotel Fund, and

- $139,000 in the L3 Special Op. Fund.

b. Plaintiff JOSEPH ANTONAKOS ("**Mr. Antonakos**") is 33 years old.  He is a citizen and resident of New York.  Mr. Antonakos invested:

- $500,000 in the L3 Income Fund.

c. Plaintiff GRACE CICCONE ("**Mrs. Ciccone**"), individually and as Executrix of the Estate of Dr. Patrick Ciccone ("**Dr. Ciccone**"), is a citizen and resident of New Jersey.  Dr. and Mrs. Ciccone collectively invested:

- $2,050,000 in the L3 Income Fund,

- $850,000 in the L3 Hotel Fund, and

- $100,000 in the L3 Special Op. Fund.

d. Plaintiff KATE FAUNTLEROY ("**Ms. Fauntleroy**") is 61 years old.  She is a citizen and resident of Texas.  Ms. Fauntleroy invested:

- $1,500,000 in the L3 Income Fund.

e. Plaintiff PERRY HARRIS ("**Mr. Harris**") is 67 years old.  He is a citizen and resident of Texas.  Mr. Harris invested:

- $200,000 in the L3 Income Fund,

- $700,000 in the L3 Hotel Fund, and

- $100,000 in the L3 Special Op. Fund.

f. Plaintiff LEROY HOWE ("**Mr. Howe**") is 83 years old.  He is a citizen and resident of Texas.  On behalf of himself and his daughter, Mr. Howe invested:

- $1,000,000 in the L3 Income Fund,

- $1,800,000 in the L3 Hotel Fund, and

- $450,000 in the L3 Special Op. Fund.

g. Plaintiff DAVID KNOX ("**Mr. Knox**") is 75 years old.  He is a citizen and resident of the Oregon.  Mr. Knox invested:

- over $275,000 in the L3 Income Fund, and

- $300,000 in the L3 Hotel Fund.

8

h. Plaintiff RICHARD KRAMER ("**Mr. Kramer**") is 73 years old.  He is a citizen and resident of Connecticut.  Mr. Kramer invested:

- $1,000,000 in the L3 Income Fund, and

- $150,000 in the L3 Hotel Fund.

i. Plaintiff DR. GREGORY LOVALLO ("**Dr. Lovallo**") is 50 years old.  He is a citizen and resident of New Jersey.  Dr. Lovallo invested:

- $805,000 in the L3 Income Fund, and

- $600,000 in the L3 Hotel Fund.

j. Plaintiff WILLIAM JOSEPH MORONEY ("**Mr. Moroney**") is 71 years old.  He is a citizen and resident of Arizona.  On behalf of the WJM Trust, Mr. Moroney invested:

- $3,000,000 in the L3 Income Fund,

- $1,800,000 in the L3 Hotel Fund, and

- $800,000 in the L3 Special Op. Fund.

k. Plaintiff DR. ROBERT SIMON ("**Dr. Simon**") is 50 years old.  He is a citizen and resident of New Jersey.  Dr. Simon invested:

- $740,000 in the L3 Income Fund.

l. Plaintiff DR. VINCENT LANTERI ("**Dr. Lanteri**") is 78 years old.  He is a citizen and resident of New Jersey.  Dr. Lanteri invested:

- $2,746,778 in the L3 Income Fund, and

- $1,500,000 in the L3 Hotel Fund.

m. Plaintiff DR. MICHAEL J. WASSERMAN ("**Dr. Wasserman**") is 85 years old.  He is a citizen and resident of Illinois.  Dr. Wasserman invested:

- $3,170,935 in the L3 Income Fund, and

- $2,000,000 in the L3 Hotel Fund.

n. Plaintiff LORI SIRIANI ("**Mrs. Siriani**") is 58 years old.  She is a citizen and resident of Florida.  Mrs. Siriani invested:

- $230,000 in the L3 Income Fund,

- $200,000 in the L3 Hotel Fund, and

- $62,500 in the L3 Special Op. Fund.

9

Thus, collectively, the above-named L3 Investors invested almost $29 million in the L3

Funds as follows:

| L3 Investor | L3 Income Fund | L3 Hotel Fund | L3 Special Op. Fund | Total |
|-------------|----------------|---------------|---------------------|-------|
| A. Siriani | $570,000 | $200,000 | $139,000 | $909,000 |
| Antonakos | $500,000 | | | $500,000 |
| Ciccone | $2,050,000 | $850,000 | $100,000 | $3,000,000 |
| Fauntleroy | $1,500,000 | | | $1,500,000 |
| Harris | $200,000 | $700,000 | $100,000 | $1,000,000 |
| Howe | $1,000,000 | $1,800,000 | $450,000 | $3,250,000 |
| Knox | $275,000 | $300,000 | | $575,000 |
| Kramer | $1,000,000 | $150,000 | | $1,150,000 |
| Lovallo | $805,000 | $600,000 | | $1,405,000 |
| Moroney | $3,000,000 | $1,800,000 | $800,000 | $5,600,000 |
| Simon | $740,000 | | | $740,000 |
| Lanteri | $2,746,778 | $1,500,000 | | |
| Wasserman | $3,170,935 | $2,000,000 | | |
| L. Siriani | $230,000 | $200,000 | $62,500 | $492,500 |
| | | | | |
| **Totals** | **$17,787,713** | **$10,100,000** | **$792,500** | **$28,680,213** |

## DEFENDANTS

15.     Defendant David J. Feingold ("**Feingold**") is a resident of Aventura, Florida, and an attorney licensed in the State of Florida.  Feingold was instrumental in developing and structuring the L3 Funds and he was a co-managing member of AG 1-6[6], while at the same time and unbeknownst to Plaintiffs, Feingold took undisclosed fees and commissions, and owned, managed, and/or controlled many of the underlying L3 Investments and/or the entities operating

---

[6] "**AG 1-6**" includes (i) Alternative Global One, LLC ("**AG1**"), (ii) Alternative Global Two, LLC ("**AG2**"), (iii) Alternative Global Three, LLC ("**AG3**"), (iv) Alternative Global Four, LLC ("**AG4**"), (v) Alternative Global Five, LLC ("**AG5**"), and (vi) Alternative Global Six, LLC ("**AG6**"), all of which are limited liability companies formed under the laws of Delaware.  AG1, AG2, AG3, AG4, AG5, and AG6, collectively, and are sometimes referred to herein as the "**L3 Income Fund's Investment Vehicles**."

the business lines.  Moreover, as explained in more detail below, after his notice of resignation from AG 1-6, Feingold became the Chief Executive Officer ("CEO") of Defendant BSI, and later the CEO of Defendant BSNY, and, upon information and belief, Feingold controls Defendant BSG Management and many of Broadstreet's largest business lines, including real estate infrastructure and merchant cash advance portfolios.

16.     Upon information and belief, Defendant Feingold, LLC is a Florida limited liability company that is owned, managed, and controlled by Feingold, and its principal place of business is 4440 PGA Boulevard, Suite 600, Palm Beach Gardens, Florida 33410 ("**Feingold Office**"). Feingold utilized the Feingold Office as the "nerve center" to orchestrate and implement his fraudulent, deceptive, and unfair scheme on behalf of himself and entities that he owns and controls.  Feingold utilized Feingold LLC in furtherance of his scheme, and Feingold LLC is the recipient of millions of dollars that rightfully belong to the L3 Funds or its investment vehicles for the benefit of all L3 Fund investors, not Feingold LLC or Feingold.

17.     Upon information and belief, Defendant Davick Capital, LLC ("**Davick**") is a Florida limited liability company that is owned, managed, and controlled by Feingold,[7] and its principal place of business is the Feingold Office in Palm Beach Gardens.  Feingold utilized Davick in furtherance of his scheme, and Davick is the recipient of millions of dollars that rightfully belong to the L3 Funds or the investment vehicles for the benefit of the L3 Fund investors, not Davick or Feingold.

18.     Upon information and belief, Defendant Feingold Morgan Sanchez, LLC ("**FMS**") is a Florida limited liability company that is owned, managed, and controlled by Feingold, and its

---

[7] Upon information and belief, Davick is a combination of the names of **Dav**id Feingold and his son Nicholas ("N**ick**") Feingold.

principal place of business is the Feingold Office in Palm Beach Gardens. Feingold utilized FMS in furtherance of his scheme and FMS is the recipient of hundreds of thousands of dollars that rightfully belong to the L3 Funds or the investment vehicles for the benefit of the L3 Fund investors, not FMS or Feingold.

19.     Upon information and belief, Defendant MCA Venture I LLC ("**MCA Venture**") is a Delaware limited liability company that is owned, managed, and controlled by Feingold, and its principal place of business is the Feingold Office in Palm Beach Gardens.  Feingold utilized MCA Venture in furtherance of his scheme and MCA Venture is the recipient of millions of dollars that rightfully belong to the L3 Funds or the investment vehicles for the benefit of the L3 Fund investors, not MCA Venture or Feingold.

20.     Upon information and belief, Defendant E Consulting Global Group, LLC ("**E Consulting**") is a Delaware limited liability company that is owned, managed, and controlled by Feingold, and its principal place of business is the Feingold Office in Palm Beach Gardens. Feingold utilized E Consulting in furtherance of his scheme and E Consulting received millions of dollars that rightfully belong to the L3 Funds or the investment vehicles for the benefit of the L3 Fund investors, not E Consulting or Feingold.

21.     Defendants Feingold, LLC, Davick, FMS, MCA, and E Consulting are collectively referred to herein as the "**Feingold Entities**."

22.     Defendant Michael Dazzo is a Florida resident and he was a co-managing member of AG 1-6.  Through his relationship with Cardinale and in his role as the "controller" of the L3 Funds and/or their investment vehicles, Dazzo acted as Feingold's primary accomplice in the theft and/or misappropriation of the assets, rights, and interests of the L3 Funds.  After his resignation

12

from AG 1-6 as detailed below, Dazzo became the Senior Managing Director of Defendant Broadstreet, Inc. and continues to maintain control over several of the L3 Investments.

23.     Upon information and belief, Defendant DZ Squared, LLC ("**DZ Squared**") is a Florida LLC owned, managed, and controlled by Dazzo, who is a member of DZ Squared and resides in Palmetto Bay, Florida.  DZ Squared received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of the L3 Fund investors, not DZ Squared or Dazzo.

24.     Upon information and belief, Defendant Ameritech Global Ventures, LLC ("**Ameritech**") is a Florida LLC owned, managed, and controlled—directly or indirectly—by Dazzo, who is a member of Ameritech and resides in Palmetto Bay, Florida.  Upon information and belief, DZ Squared received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of all L3 Fund investors, not Ameritech or Dazzo.

25.     Defendants DZ Squared and Ameritech are collectively referred to herein as the "**Dazzo Entities**."

26.     Defendant Richard Cardinale ("**Cardinale**") is a resident of New York. Cardinale raised capital for the L3 Funds, acted for Defendant L3 Capital Management, LLC., was a co-managing member of AG 1-6 until Feingold and Dazzo resigned in January 2022, and he is currently the sole manager of AG 1-6.[8]  Upon information and belief, Cardinale himself personally invested over $600,000, and together with his family members invested over $2.8 million, in the L3 Funds.  Unbeknownst to L3 Investors, Cardinale took undisclosed fees and commissions from many of the underlying L3 Investments and/or the entities operating the business lines.  Cardinale

---

[8] Richard Cardinale has acted as AG 1-6's sole Manager under the terms of AG 1-6's Operating Agreements since Feingold and Dazzo's resignation in January 2022, as detailed below.

received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of all L3 Fund investors, not Cardinale.

27.     Defendant L3 Capital Management, LLC ("**L3 Manager**") is a limited liability company organized and operating under the laws of New York, and its sole managing member is Richard Cardinale, a citizen and resident of New York.  The L3 Manager manages all three L3 Funds for the benefit of the L3 Funds' investors.  L3 Manager received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of all L3 Fund investors, not L3 Manager or Cardinale.

28.     Defendant L3 Capital Advisors, LLC ("**L3 Advisors**") is a limited liability company organized and operating under the laws of New York, and its sole managing member is Richard Cardinale, a citizen and resident of New York.  The L3 Advisors managed all three L3 Funds for the benefit of the L3 Funds' investors prior to L3 Manager.  L3 Advisors received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of all L3 Fund investors, not L3 Advisors or Cardinale.

29.     Defendant RVCSI ("**RVCSI")** is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCSI" stands for "Richard Vania Cardinale Staten Island." Cardinale is a citizen of New York and Cardinale claims to be the only member of RVCSI, LLC.  RVCSI is an alter-ego entity of Cardinale.  RVCSI received monies that rightfully belong to the L3 Funds or the investment vehicles for the benefit of all L3 Fund investors, not RVCSI or Cardinale.

30.     Defendants L3 Manager, L3 Advisors and RVCSI are collectively referred to herein as the "**Cardinale Entities**."

31.     Defendant Joseph Baldassarra ("**J. Baldassarra**") is a resident of Simpsonville, South Carolina.  He is the President of Defendant BSI and a managing member of BSG Management.  Upon information and belief, J. Baldassarra's responsibilities include acting as an investment advisor to the BSG Fund, soliciting investors for the BSG Fund, and supervising BSI's internal sales staff who, among other things, solicit investors for the BSG Fund.

32.     Defendant Steven Baldassarra ("**S. Baldassarra**") is a resident of Simpsonville, South Carolina.  He is the Chief Operating Officer ("COO") of BSI and a managing member of BSG Management.  Upon information and belief, S. Baldassarra's responsibilities include acting as an investment advisor to the BSG Fund and performing back-office functions for the Broadstreet Entities, including overseeing BSG Fund's and BSG Management's bank accounts and accounting staff.

33.     Upon information and belief, Defendant JDS Partners ("**JDS**")—an acronym for **J**oseph (Baldassarra), **D**avid (Feingold), and **S**teven (Baldassarra)—is a South Carolina partnership owned and managed, directly or indirectly, by the Baldassarras (residents of South Carolina) and Feingold (a resident of Florida).  JDS is a separate partnership entity that covertly provided Feingold and the Baldassarra Brothers with interests in the L3 Investments without the L3 Funds, the L3 Manager, Cardinale, or the L3 Investors' knowledge.

34.     Defendant Broadstreet, Inc. ("**BSI**") is a Delaware corporation formed in June 2022 with its principal place of business in Greenville, South Carolina.  Upon information and belief, BSI's voting shares are owned equally by Feingold (a Florida resident) and the Baldassarras and unanimity is required for all shareholder decisions.  Upon information and belief, Feingold has always been BSI's CEO.  J. Baldassarra has always been BSI's President, and S. Baldassarra has always been BSI's COO.

15

35.     Defendant Broadstreet Global Fund, LLC ("**BSG Fund**" or "**Broadstreet Fund**") is a multi-series Delaware limited liability company that was formed on or about September 14, 2020.  The BSG Fund is a private equity fund and investors in the fund become Members of the fund.  The BSG Fund has no managing board and cannot act for itself. Instead, the BSG Fund acts exclusively through its Manager, BSG Management.  According to the SEC Enforcement Action, the Broadstreet Entities raised more than $1 billion from investors and more than $880 million was transferred to BSG Management's bank accounts and extensively commingled.

36.     Defendant Broadstreet Global Management, LLC ("**BSG Management**") is a South Carolina limited liability company owned and managed by the Baldassarras.  BSG Management is the designated Manager of the BSG Fund.  Although Feingold does not technically own or manage BSG Management, upon information and belief, Feingold controls BSG Management alongside the Baldassarras.

37.     Defendant Broadstreet Global Holdings, LLC ("**BSGH**") is a South Carolina LLC officially owned and managed by the Baldassarras.  However, upon information and belief, Feingold controls BSGH and BSGH pays the supposed "expenses" of all the Broadstreet Entities, including BSI, BSG Fund, and BSG Management, all as directed by Feingold from the Feingold Office in Florida.

38.     The following organizational chart appeared on Broadstreet's website until March 2024, showing the Broadstreet Fund invested in multiple, separate "Subseries:"



39.     Defendant Broadstreet New York, Inc. ("**BSNY**") is a New York corporation formed on January 9, 2023, just eight days before its filing of an interpleader action related to many of the L3 Investments as detailed below.  BSNY is an affiliate of BSI, and according to Feingold who is the CEO of BSNY, BSNY is a special purpose entity that was set up to collect substantial sums of money, "some of which should be distributed" to L3 investors.  Upon information and belief, BSNY has no practical separate or distinct existence from BSI and its sole purpose is to house stolen assets from the L3 Funds and the L3 Investors.  Upon information and belief, Feingold and the Baldassarras own and manage BSNY.

## FACTUAL BACKGROUND

40.     For the past three years, the L3 Investors have watched as the Defendants have brought numerous lawsuits and private arbitrations that, at heart, squabble over who gets to take control of money and assets that rightfully belong to the L3 Funds and the L3 Investors.

41.     As a result, the L3 Investors have not received any distributions from or been able to withdraw their investments in the L3 Funds for the past two years.

42.     The L3 Investors have been fed lies from different factions of the Defendants that these numerous lawsuits and arbitrations were in the L3 Investors' best interests.

43.     The Plaintiffs would eventually learn that this was not true.

44.     Several of the Plaintiffs are part of a group of L3 Investors that sued the L3 Income Fund, Cardinale[9], L3 Manager and L3 Advisor in AAA arbitration.  Currently, this AAA action has been stayed.

45.     These L3 Investors initiated the arbitration process in June 2023 and through discovery in that proceeding uncovered what happened to the money the L3 Investors invested in the L3 Income Fund.[10]

46.     Much of what they learned has not been discussed in any of the lawsuits brought by Defendants relating to the L3 Funds, nor has the true damage from Defendants' actions been sought in any of these lawsuits.

47.     Many of the pleadings filed in Defendants' lawsuits have been shared with the L3 Investors through the L3 investor portal.

48.     From the pleadings that have been shared the L3 Investors have learned that in the beginning of 2019, after more than twenty-five years as a financial and investment advisor in the

---

[9] In the AAA action Defendant Cardinale has argued that he has not submitted to AAA's jurisdiction in his personal capacity, only in his capacity as an officer of L3 Manager.  If the AAA arbitrators agree with his position, then the only place to hold Cardinale personally liable is in court.

[10] During discovery in the AAA arbitration the L3 Investors through their attorneys were able to analyze the bank account statements for the L3 Capital Income Fund, Alternative Global Management and Alternative Global 1 through 6, as well as records purporting to reflect the performance of the L3 Funds' investments in Samson, a merchant cash advance business.

securities industry, Cardinale decided he wanted to raise capital to make direct investments in growth and steady cash flow industries such as merchant cash advance, debt settlement, and real estate.

49.     Cardinale first discussed this idea with Dazzo, his longtime friend and business associate.  Dazzo suggested that Cardinale share his ideas with Feingold, a Florida licensed attorney who, according to Dazzo, had relationships with real estate development firms and hotel chains.  Cardinale agreed to share his plans with Feingold.

50.     Cardinale invited Feingold and Dazzo to his New York office to discuss the proposed new venture and what resources and roles they could bring to the table.  Feingold held himself out as someone who not only had significant institutional contacts but was an experienced attorney who could develop and execute the proper structure for the venture.

51.     Feingold was a wolf inviting himself into the proverbial hen house.  Starting at that first meeting, Feingold set in motion a convoluted and complicated conspiracy that allowed him to covertly usurp control of the L3 Investments so that he could misappropriate investors' assets and line his own pocket.

52.     Based in large measure on Feingold's advice and direction, Cardinale, Feingold, and Dazzo ultimately agreed on the creation of three private equity funds—the L3 Funds—utilizing multiple investment vehicles as further detailed below.  Based largely on Cardinale's relationships with investors, the L3 Funds raised almost $150 million from almost 100 individual investors to fund the following projects and investments, as further detailed below:

     a.   Asheville Hotel Project (L3 Hotel Fund – Series A)

     b.   Raleigh Hotel Project (L3 Hotel Fund – Series B)

     c.   Myrtle Hotel Project (L3 Hotel Fund – Series C)

d.  Ormond Hotel Project (L3 Hotel Fund – Series D)

e.  Gaffney Outparcels (2) (L3 Special Op. Fund)

f.  Merchant Cash Advance Portfolios at Samson (L3 Hotel and L3 Income Funds)

   i.  Asheville

   ii.  Raleigh

   iii.   Myrtle

   iv.  L3SP

   v.  Alternative Spin

g.  Land Infrastructure Projects (L3 Income Fund – AG2, AG4, and AG5)

h.  Debt Settlement Businesses (L3 Income Fund – AG3)

i.  Custom Home Building Projects (L3 Income Fund – AG6)

## I.    THE L3 HOTEL FUND AND INVESTMENT VEHICLES

53.    The L3 Hotel Fund was created to invest in hotel projects. There are four total series in the L3 Hotel Fund, each created for discrete investments in specific hotel projects (as further defined and detailed below): (i) the Asheville Hotel Project – Series A, (ii) the Raleigh Hotel Project – Series B, (iii) North Myrtle Beach Hotel Project – Series C, and (iv) Ormond Beach Hotel Project – Series D.

54.    The Asheville Hotel Project and Raleigh Hotel Project predate the L3 Hotel Fund, but upon the formation of the L3 Hotel Fund, the investment funds for the respective projects, Asheville Investment and Raleigh Investment (both defined below), became wholly owned subsidiaries of the L3 Hotel Fund.  Investors in the original funds became Series A (Asheville Investment) and Series B (Raleigh Investment) members in the L3 Hotel Fund.

55.     Cardinale, Feingold, and Dazzo each had specific roles. Cardinale raised money from investors to invest in the hotel projects; Feingold participated in drafting various investment and legal documents, including private placement memoranda ("PPMs"), operating agreements, and subscription agreements.  Dazzo acted as the comptroller and was the authorized signatory on the L3 Hotel Fund's bank account(s).

56.     The L3 Hotel Fund raised a total of approximately $47 million from individual investors.

### A.     *The Asheville Hotel Project (Series A)*

57.     The L3 Hotel Fund's Series A was created to fund a project identified by Feingold for the construction of a Marriott TownePlace Suites located on the Northwest corner of the intersection of I-40 and Brevard Road (the "**Asheville Hotel Project**"), and more fully described as 140 South Bear Creek Road, in Asheville, Buncombe County, North Carolina (the "**Asheville Hotel Project Site**").

58.     In or about the Spring of 2019, Feingold directly interfaced with Ford Elliott and Joshua Howard, Esq. of Blackstream Development, LLC ("**Blackstream**")—a real estate development business located in South Carolina—related to the operations and projected cash needs of the Asheville Hotel Project.  Blackstream, through Maxine Turner, requested an equity investment in the Asheville Hotel Project.

59.     At Feingold's direction, a special purpose vehicle, Asheville Investment I, LLC f/k/a TownePlace Asheville Investment I, LLC ("**Asheville Investment**"), was created to raise funds from individual investors to make an equity investment in the Asheville Hotel Project. Pursuant to the structure created and recommended by Feingold, Asheville Investments would be

indirectly co-managed by a multi-member limited liability company indirectly owned by (1) Cardinale, (2) Dazzo, and (3) Feingold.

60.     Feingold drafted, participated in the drafting, and/or made detailed changes and comments on the Private Placement Memorandum ("PPM"), Subscription Agreement, Operating Agreement, and other offering materials for Asheville Investment, which were provided to prospective investors.  See Offering Memorandum and Subscription Agreement for TownePlace Asheville Investment I, LLC attached as **Composite Exhibit D page 113**.

61.     In total, Asheville Investment raised $7.8 million from 32 investors, thereby making them direct equity members in Asheville Investment.

62.     On or about May 21, 2019, Blackstream's Joshua Howard organized Bear Creek Holdings, LLC ("**Bear Creek**"), a South Carolina limited liability company, as the special purpose vehicle to own and operate the Asheville Hotel Project.

63.     Thereafter, on or about June 4, 2019, BB-BCH, LLC ("BB-BCH"), a South Carolina limited liability company, and Asheville Investment entered into an Operating Agreement of Bear Creek whereby (1) BB-BCH was recognized as the 30% member and a Manager of Bear Creek; (2) *Asheville Investment was recognized as the 70% member and a Manager of Bear Creek*; and (3) Feingold was recognized as the "designee" of Asheville Investment.

64.     In or about June 2019, including, but not limited to, June 20 and June 21, 2019, Feingold solicited to be granted a Power of Attorney executed by Asheville Investment for the Asheville Hotel Project ("**Asheville POA**"), for the ostensible purpose of "talk[ing]" to Marriott "to keep things moving along and not have to wait for everyone to sign off on matters that I am regularly handling for this project on a daily basis."

22

65.     Feingold, a licensed-attorney and indirect co-managing member in the project, drafted the Asheville POA.  In it, Feingold authorized himself to "[e]xecute such documents and make such decisions for the development of the [Asheville Hotel] Project in dealing with any and all vendors, service providers, developers, contracts, architects, engineers, consultants or any other entities so involved in the development of the Project including but not limited to Marriott International, Ford Elliott, Josh Howard, Esq. and/or Bear Creek Holdings, LLC or any affiliates ore related entities of the same as may be involved in the Project."

66.     In August 2019, Feingold continued to draft and/or participate in the drafting of the offering materials for the Asheville Hotel Project, and Asheville Investment continued to raise funds from individual investors.

67.     In August 2019, Asheville Investments wired $1,797,291.00 to purchase the Asheville Hotel Project Site.  The Closing Statement, which was countered-signed by Feingold, acknowledged that the Asheville Investment was the sole source of the funds used by Bear Creek to purchase the site.

68.     On or about August 29, 2019, Bear Creek signed its Franchise Agreement with Marriott, and in it confirmed that Asheville Investment was the 70% member of Bear Creek.

69.      Between June 2019 and January 2020, at Feingold's direction, Asheville Investment wire transferred to Bear Creek an additional $1.5 million on the draw requests of Blackstream and Bear Creek for the Asheville Hotel Project.

70.     Because the Asheville Hotel Project was not immediately ready for construction, at Feingold's direction, an investment portfolio for merchant cash advances ("**MCA**") was created at Samson Horus, LLC ("**Samson**") (hereinafter the "**Asheville Portfolio**"). At Feingold's insistence, Feingold also acted as the point of contact with Samson, directing funds into and out of the

23

Asheville Portfolio.  Feingold never disclosed that he held a role with Samson or that he was receiving fees and commissions related to the Asheville Portfolio.

71.     Between August and October 2019, Asheville Investment wired an additional $3,900,000.00 into the Asheville Portfolio at Samson.

72.     Unbeknownst to L3 Investors at the time, Feingold received and, upon information and belief, continues to receive, millions of dollars in undisclosed management fees and commissions from Samson in connection with the Asheville Portfolio and other L3 Fund portfolios (as detailed below).  In fact, based in part on evidence submitted in the SEC Enforcement Action, Plaintiffs have reason to believe that Feingold has commingled investor monies at Samson, is using Samson as his own personal piggy-bank with no investor oversight or control, and Samson has paid Feingold and continues to pay Feingold on every single dollar invested, every single week, on every single portfolio initiated by Feingold, including the Asheville Portfolio.

73.     More specifically, upon information and belief, Feingold has received and continues to receive 20% of the commissions and 50% of the management fees that Samson has deducted and received from the Asheville Portfolio.  Feingold never disclosed those commissions and fees he received from Samson.

74.     In addition to the undisclosed fees and commissions, Feingold improperly siphoned additional monies from the Asheville Portfolio to Davick Capital, an entity Feingold owns and controls.

75.     From 2020 through early 2022, the L3 Hotel Fund and the L3 Investors received approximately 12% annual distributions from this investment. [11]   But then the distributions stopped.

76.     Upon information and belief, a significant portion of the remaining $2.6 million of the funds raised for the Asheville Investment was distributed to Feingold, Dazzo and Cardinale. These distributions were never disclosed to the L3 Investors.  This money rightfully belongs to the L3 Hotel Fund or the Investment Vehicle for the benefit of the L3 Hotel Fund's investors, not Feingold, Dazzo or Cardinale.

77.     And, although the TownePlace Suites in Asheville, NC has been open since April 2022, the L3 Hotel Fund and the L3 Investors have not received any more returns on their multi-million-dollar investment in the Asheville Hotel Project.

78.     Worse yet, it appears that Broadstreet has hijacked ownership, management and control of the Asheville Hotel Project, and has been representing to current and prospective investors that the Asheville Hotel Project is a Broadstreet project, even though 100% of the monies used to purchase the Asheville Hotel Project Site came from Asheville Investment.

### B.      The Raleigh Hotel Project (Series B)

79.     The L3 Hotel Fund's Series B was created to fund a project identified by Feingold to acquire a property for a Marriott TownePlace Suites, located at 1021 Carrington Mill Boulevard, Morrisville, North Carolina 27560 ("**Raleigh Hotel Project**"), through an SPV that was "owned and controlled by Ford Elliott" of Blackstream.  Feingold directly interfaced with Ford Elliott and Joshua Howard of Blackstream on the operations and projected cash needs of the Raleigh Hotel

---

[11] As discussed in detail below, the Samson investment never generated any profit, thus the 12% annual distributions to the L3 Investors were simply a return of their own money.

Project.  Blackstream, through Maxine Turner, requested an equity investment in the Raleigh Hotel Project.

80.     In or about January 2020, Feingold participated in the drafting of offering materials, including a PPM, Operating Agreement, and investment summary for an investment in Raleigh Investment I, LLC ("**Raleigh Investment**"), which was created to fund the Raleigh Hotel Project. The Raleigh Investment Subscription Agreement is attached as **Composite Exhibit D pages 83-112**.

81.     On February 11, 2020, Blackstream's Joshua Howard organized Carrington Mill Holdings, a South Carolina limited liability company, as an SPV for the Raleigh Hotel Project.

82.     Raleigh Investment owned 80% of Carrington Mill Holdings, LLC ("**Carrington Mill**"), the special purpose vehicle created for the Raleigh Hotel Project.

83.     Raleigh Investment raised $8.7 million from 58 investors, thereby making them direct equity members in Raleigh Investment.

84.     Between February 2020 and April 2020, Raleigh Investment wired Blackstream $800,000 for the Raleigh Hotel Project.

85.     To address Raleigh Investment's long-term funding needs, it created a merchant cash advance portfolio with Samson ("**Raleigh Portfolio**").  Feingold was the Raleigh Portfolio's point of contact, giving him authority to direct funds going in and out of the Raleigh Portfolio. Feingold never disclosed that he held a role with Samson or that he was receiving fees and commissions related to the Raleigh Portfolio.

86.     Raleigh Investment wired $4,568,000.00 into the Raleigh Portfolio.  Feingold directed $2,141,397.02 of those funds into an unknown bank account, and between October 2020 and January 2022, directed $1,934,372.87 into a Davick bank account.

87.     From 2020 through early 2022, the L3 Hotel Fund and the L3 Investors received approximately 12% annual distributions from this investment. [12]   But then the distributions stopped.

88.     Upon information and belief, a significant portion of the remaining $1.4 million of the funds raised for the Raleigh Investment was distributed to Feingold, Dazzo and Cardinale. These distributions were never disclosed to the L3 Investors.  This money rightfully belongs to the L3 Hotel Fund or the Investment Vehicle for the benefit of the L3 Hotel Fund's investors, not Feingold, Dazzo or Cardinale.

89.     Since then, the L3 Hotel Fund and the L3 Investors have not received any more returns on their multi-million-dollar investment in the Raleigh Hotel Project.

90.     Worse yet, it appears that Broadstreet has hijacked ownership, management and control of the Raleigh Hotel Project, and has been representing to current and prospective investors that the Raleigh Hotel Project is a Broadstreet project.

### C.     *The North Myrtle Beach Hotel Project (Series C)*

91.     The L3 Hotel Fund's Series C was created to fund a project identified by Feingold to develop a Residence Inn by Marriott in North Myrtle Beach, South Carolina ("**North Myrtle Beach Hotel Project**").  Upon information and belief, the L3 Hotel Fund owned 70% of Crescent Beach Holdings, LLC ("**Crescent Beach**"), the special purpose vehicle created for the North Myrtle Beach Hotel Project.

92.     Feingold developed the critical documents for the project, including financial projections and investor presentations.

---

[12] As discussed in detail below, the Samson investment never generated any profit, thus the 12% annual distributions to the L3 Investors were simply a return of their own money.

93.     The L3 Hotel Fund raised at least $15.3 million for its Series C investment in the North Myrtle Beach Hotel Project.

94.     Between September and October 2021, on Feingold's direction and Dazzo's implementation, the L3 Hotel Fund transferred $9,300,000.00 earmarked for the North Myrtle Beach Hotel Project and/or the Ormond Beach Hotel Project (described below) to Blackstream's bank account.  Dazzo authorized each transfer as earmarked for "REAL ESTATE DEAL."

95.     Because the North Myrtle Beach Hotel Project was not immediately ready for construction, the L3 Hotel Fund created a merchant cash advance portfolio with Samson ("**L3 North Myrtle Beach Portfolio**"). At Feingold's direction, Dazzo caused the L3 Hotel Fund to transfer another $9,500,000.00 to the L3 North Myrtle Beach Portfolio so that the funds could appreciate while development approvals proceeded forward on the North Myrtle Beach Project. Dazzo authorized each of the transfers into the North Myrtle Beach Portfolio.  Feingold never disclosed that he held a role with Samson or that he was receiving fees and commissions related to the L3 North Myrtle Beach Portfolio.

96.     Feingold provided instructions to Samson on where to send funds.  Between August and November 2021, Feingold directed Samson to send $4,043,000.00 to Blackstream from the North Myrtle Beach Portfolio.  In summary, between August and November 2021, Blackstream – at Feingold's direction – received a total of $13,043,000.

97.     Three days after the last of such transfers, or on or about November 29, 2021, Blackstream used, controlled, and distributed a portion of the funds from to or on behalf of North Myrtle, which acquired the North Myrtle Beach Project Site for the sum of $7,000,000.

98.     From 2020 through early 2022, the L3 Hotel Fund and the L3 Investors received approximately 12% annual distributions from this investment.  But then the distributions stopped.[13]

99.     Upon information and belief, a significant portion of the remaining $1.8 million of the funds raised for the North Myrtle Beach Hotel Project was distributed to Feingold, Dazzo and Cardinale.  These distributions were never disclosed to the L3 Investors.  This money rightfully belongs to the L3 Hotel Fund or the Investment Vehicle for the benefit of the L3 Hotel Fund's investors, not Feingold, Dazzo or Cardinale.

100.    Since then, the L3 Hotel Fund and the L3 Investors have not received any more returns on their multi-million-dollar investment in the North Myrtle Beach Hotel Project.

101.    Worse yet, it appears that Broadstreet has hijacked ownership, management and control of the North Myrtle Beach Hotel Project, and has been representing to current and prospective investors that the North Myrtle Beach Hotel Project is a Broadstreet project.

### D.     *The Ormond Beach Hotel Project (Series D)*

102.    The L3 Hotel Fund's Series D was created to fund a project identified by Feingold and Dazzo to develop a Residence Inn by Marriott in Ormond Beach, Florida ("**Ormond Beach Hotel Project**").  L3 Hotel Fund owned a significant portion of Ormond Beach Holdings, LLC ("**Ormond Beach**"),[14] the special purpose vehicle created for the Ormond Beach Hotel Project.

103.    In Summer 2021, Feingold drafted a pitch book for the Ormond Beach Hotel Project and participated in drafting a private placement memorandum and subscription agreement for the Ormond Beach Hotel Project.

---

[13] As discussed in detail below, the Samson investment never generated any profit, thus the 12% annual distributions to the L3 Investors were simply a return of their own money.

[14] The "**Blackstream Hotel SPVs**" are, collectively, Bear Creek, Carrington Mill, Crescent Beach, and Ormond Beach.

104.    The L3 Hotel Fund raised $15.3 million for its Series D investment in the Ormond Beach Hotel Project.

105.    On January 12, 2022, among other dates and times, Blackstream used, controlled, and distributed the funds to or on behalf of Ormond Beach to acquire the property for the Ormond Beach Hotel Project for $5.3 million. Upon information and belief, Blackstream also used the funds to purchase the adjacent property for $2,050,000.00 for parking and residential purposes.

106.    From 2020 through early 2022, the L3 Hotel Fund and the L3 Investors received approximately 10% annual distributions from this investment.[15]  But then the distributions stopped.

107.    Upon information and belief, a significant portion of the remaining $5 million of the funds raised for Ormond Beach was distributed to Feingold, Dazzo and Cardinale.  These distributions were never disclosed to the L3 Investors.  This money rightfully belongs to the L3 Hotel Fund or the Investment Vehicle for the benefit of the L3 Hotel Fund's investors, not Feingold, Dazzo or Cardinale.

108.    Since then, the L3 Hotel Fund and the L3 Investors have not received any returns on their multi-million-dollar investment in the Ormond Beach Hotel Project.

109.    Worse yet, it appears that Broadstreet has hijacked ownership, management and control of the Ormond Beach Hotel Project, and has been representing to current and prospective investors that the Ormond Beach Hotel Project is a Broadstreet project.

**II.    L3 SPECIAL OP. FUND AND INVESTMENT VEHICLES**

110.    The L3 Special Op. Fund was created for investments two pieces of vacant land identified by Feingold ("**Gaffney Outparcels**").  The Gaffney Outparcels provided a unique

---

[15] Only about half the money raised for the Ormond Beach Hotel Project was distributed to Blackstream.  The remaining moneys (appx. $8 million) was never invested in Samson or any other investment.  Thus, the 10% annual distributions the L3 Investors received was actually a return of their own money.  This fact was never disclosed to the L3 Investos.

investment opportunity because they were adjacent to a planned but unannounced D.R. Horton residential project.  Upon information and belief, the L3 Special Op. Fund owned a significant portion of Hyatt Street Holdings, LLC ("**Hyatt Street**"), the special purpose vehicle created for the Gaffney Outparcels.

111.    Cardinale, through L3 Manager, managed the L3 Special Op. Fund.

112.    Feingold was responsible for certain investor materials provided for the L3 Special Op. Fund.  The L3 Special Op. Fund Series A raised $7 million and Series B raised $10 million for the Gaffney Outparcels.  Dazzo, again, acted as the L3 Special Op. Fund's comptroller.

113.    Between April 2021 and December 2021, the L3 Special Op. Fund transferred $15,299,500.00 to Blackstream for the purchase of the Gaffney Outparcels.  Feingold directed, supervised, or knew of every transfer from the L3 Special Op. Fund to Blackstream.  Dazzo authorized and signed off on each wire transfer from the L3 Special Op. Fund, identifying them as all earmarked for "REAL ESTATE DEAL."

114.    The L3 Special Op. Fund and the L3 Investors have not received any returns on their multi-million-dollar investment in the Gaffney Outparcels.

115.    Upon information and belief, a significant portion of the remaining $1.7 million of the funds raised for the L3 Special Op. Fund was distributed to Feingold, Dazzo and Cardinale. These distributions were never disclosed to the L3 Investors.  This money rightfully belongs to the L3 Special Op. Fund or the Investment Vehicle for the benefit of the L3 Hotel Fund's investors, not Feingold, Dazzo or Cardinale.

116.    Worse yet, it appears that Broadstreet has hijacked ownership, management and control of Gaffney Outparcels and/or the proceeds to be used for this investment, and has been representing to current and prospective investors that Gaffney Outparcels is a Broadstreet project

31

and/or the funds earmarked for this project have been utilized or commingled with funds for another project, without consent of the investors.

### III.   THE L3 INCOME FUND AND INVESTMENT VEHICLES

117.   In late 2019 through early 2020, Feingold devised the following investment structure for the L3 Income Fund:

- Cardinale would create the L3 Income Fund and raise capital from individual investors;

- The L3 Income Fund would loan that capital to investment vehicles that would deploy the funds into specific investment opportunities;

- When the investment vehicles received returns, they would make payments on the loans from the L3 Income Fund, which, in turn, could make distributions to L3 investors;

- If the investment vehicles were profitable beyond the amounts of principal and interest owed to the L3 Income Fund on its loans, profits could be distributed to a separate entity called Alternative Global Management, LLC ("AGM"), which, in turn, could make distributions to its members.[16]

118.   Feingold also suggested specific roles for each of them.  Cardinale, based on his relationships and experience, would be primarily responsible for raising capital for the L3 Income Fund.  Meanwhile, Feingold would manage the day-to-day operations of the investment vehicles, and Dazzo would act as the comptroller.  This gave Feingold and Dazzo control over the investment vehicles' investments and the relationships associated with those investments.

119.   The L3 Income Fund was officially formed on August 21, 2019.

---

[16] Entities owned and controlled by Feingold, Dazzo, and Cardinale are each one-third (1/3) co-managing members of AGM (Class A, voting rights).  Investors who invested $1 million or more in the L3 Income Fund also became non-voting members of AGM (Class B) and thereby could share in profit distributions.

120.    Between November 2019 and July 2020, Cardinale, Feingold, and Dazzo formed AG 1-6 to serve as the L3 Income Fund's investment vehicles.  Cardinale, Feingold, and Dazzo were all equal members and co-managers of AG 1-6.

121.    At approximately the same time, Cardinale, Feingold, and Dazzo formed AG1, a separate entity called AGM was also formed.  AGM was formed at least in part in anticipation of receiving excess profits (if any) from multiple entities (AG 1-6) that may be earned above the amounts owed to the L3 Income Fund.  In or around September 2021, AGM's Operating Agreement was amended, so that investors who invested $1 million or more in the L3 Income Fund (and were thereby investor/members in the L3 Income Fund) also became non-voting members of AGM (Class B) and thereby could share in AGM's profit distributions in addition to their L3 Income Fund interest distributions.[17]

122.    Cardinale, Feingold, and Dazzo all agree that AG 1-6 must pay its loans to the L3 Income first, and AGM investors would share in any profits only if there are any additional monies after the L3 loans are paid.

123.    The L3 Funds and its Investment Vehicles initially operated just as Feingold suggested, with Cardinale focused on raising capital, and Feingold and Dazzo handling the day-to-day operations of AG 1-6.  Feingold and Dazzo were responsible for, among other duties:

    a.  researching and analyzing potential investments;

    b.  presenting investment opportunities;

    c.  allocating and disbursing funds to the investment companies;

    d.  approving payment AG 1-6's ordinary fees and expenses;

    e.  managing receipts and payments to AG 1-6;

---

[17] An additional thirty-seven investors obtained Class B (non-voting) membership interests in AGM.

    f.   monitoring investment progress;

    g.   preparing quarterly reports; and

    h.   generally managing AG 1-6's day-to-day operations.

124. Feingold—and eventually Dazzo—used this control of AG 1-6 to initiate and ultimately carry out their conspiracy to, through fraudulent, deceptive, and unfair practices, deprive the L3 Income Fund and the L3 Investors of the benefit of their bargain while enriching themselves and their co-conspirators.

125. Though Feingold and Dazzo were equal co-managing members of AG 1-6, Feingold and Dazzo were never members or managers of the L3 Income Fund.  Indeed, Feingold and Dazzo invested exactly $0 in the L3 Funds

### A.    *The L3 Income Fund Raises $81 Million*

126. Feingold, holding himself out as a businessman and licensed attorney acting in the best interest of the L3 Income Fund and AG 1-6, heavily advised on the legal and investor documents for the L3 Income Fund and AG 1-6, including the AG 1-6 Operating Agreements and the L3 Income Fund's private placement memoranda ("PPM") to investors.[18]  The L3 Income Fund's PPM stated that investors could expect an annual return between 12% and 15% on their investments.[19]

127. Cardinale began raising capital through the L3 Income Fund.  Cardinale quickly raised $50 million from himself, his family, and his long-standing investor relationships.  But that

---

[18] At the November 4-5, 2024 hearing in the Southern District of Florida before Magistrate Judge Lisette M. Reid, *Case No. 22-CV-20375*, Feingold testified that he used his old legal templates to create these documents with the express intention of ensuring he would not have to answer to any of the investors for his actions.

[19] See L3 Income Fund PPM, on page 5 of **Composite Exhibit B**; L3 Income Fund Amended PPM, on page 5 of **Composite Exhibit C**.

was not enough for Feingold, who insisted that Cardinale raise at least $75 million so that they could invest with larger institutional players in the real estate industry.

128.    Ultimately, the L3 Income Fund raised a total of $81 million from approximately 100 investors, many of whom have business and personal relationships with Cardinale.

129.    The L3 Income Fund then loaned funds to AG 1-6 as follows:[20]

- AG1:      $45,705,621.00
- AG2:      $18,657,791.00
- AG3:      $3,939,925.60
- AG4:      $8,894,361.00
- AG5:      $831,057.00
- AG6:      $5,916,250.00

### B.      AG 1-6 Invest in the Investment Companies

130.    Feingold and Dazzo then wired the Loaned Funds to companies that they had identified and selected for investment, including: (1) Samson Horus, LLC ("**Samson**"); (2) Blackstream Development, LLC ("**Blackstream**"); (3) Durham Homes, LLC ("**Durham Homes**"); (4) the DCGs; and (5) Culvers (collectively, "**Investment Companies**").

### 1.      Samson

131.    AG1, AG2, and AG4 invested a total of $50.3 million in merchant cash advance portfolios held by Samson, a merchant cash advance company based in New York.

132.    Feingold made, directed, and managed the investments in Samson's portfolios until at least May 2022.

---

[20] The loaned funds included both the $81 million raised and an additional $3 million in reinvested funds.

133.    Unbeknownst to the L3 Investors at the time, upon information and belief, Feingold held direct or indirect undisclosed interests or influence in Samson and received substantial sums in "management fees" and "commissions" connected to portfolios in which AG1, AG2, AG4 and others were invested.[21]

134.    In fact, based in part on evidence submitted in the SEC Enforcement Action, Plaintiffs have reason to believe that Feingold has commingled investor monies at Samson, is using Samson as his own personal piggy-bank with no investor oversight or control, and Samson has paid Feingold and continues to pay Feingold on every single dollar invested, every single week, on every single portfolio initiated by Feingold, including the L3 Income Fund's portfolios.

135.    More specifically, upon information and belief, Feingold has received and continues to receive 20% of the commissions and 50% of the management fees that Samson has deducted and received from the L3 Income Fund's portfolio, but Feingold never disclosed those commissions and fees he received from Samson.

136.    In addition to the undisclosed fees and commissions, Feingold improperly siphoned additional monies from the L3 Income Fund's portfolio to Davick Capital, an entity Feingold owns and controls.  Upon information and belief, Davick received somewhere between $3.2 million to $7.7 million directly from the L3 Income Fund's portfolio.

---

[21] In the SEC Enforcement Action, the SEC's expert witness testified that Feingold "oversaw the [Broadstreet MCA portfolios] on behalf of Samson." She testified that "he oversaw them, that he oversees 14 portfolios for Samson, and that he participates in the due diligence process, etcetera, …" and that Feingold "receives or an entity that he is associated with, its called MCA Venture One, … receives 20 percent of the commissions and 50 percent of the management fees charged by Samson." SEC Hearing Tr., 136:18-138:4.  Further, though Broadstreet's first MCA investment with Samson was in June 2022, 136:13-17, Feingold began receiving additional fees from Samson no later than 2021, when Feingold was working on behalf of the L3 Funds; and his Samson fees exceed $15 million. 138:5-7.

137. The Samson portfolios' performance was also contrary to what was represented to the L3 Investors. The quarterly reports sent to L3 Investors claimed merchant cash advances—short-term and quick funding transactions to small businesses—generated significant profits when they did not.

138. Feingold, with the assistance of his son, Ryan Feingold, periodically prepared the quarterly reports for the L3 Funds that were distributed to the L3 Investors.

139. From October 2019 through April 2022 Feingold, Dazzo and Cardinale invested $50.3 million of the L3 Income Fund's asset into Samson.

140. As of May 2024, only $46.8 million of this money has been collected back from Samson. Resulting in a $3.5 million loss on this investment.

141. Further, Feingold, Dazzo and Cardinale took "profits" from the L3 Income Fund's Samson investment when no profits were generated.

142. In January 2022, Feingold and Dazzo notified Cardinale that they were ending their partnership with him.

143. By then, $32.3 million of the $50.3 million invested in Samson had already been pulled out of this investment.

144. This significant withdrawal of the funds invested dramatically impaired the L3 Income Fund's ability to generate any interest income from the Samson investment.

145. Moreover, approximately $24.6 million of the $32.3 million withdrawn from this investment went directly into Feingold, Dazzo and Cardinale's pocket, which was never disclosed to investors.

146. During the same time that the three partners collected $24.6 million for themselves, they paid out only $16.8 million back to the L3 Income Fund to make distributions to the L3 Investors.[22]

147. So, after agreeing that they as AGM investors would share in any profits only if there are any additional monies after the L3 loans are paid, **Feingold, Dazzo and Cardinale paid themselves $24.6 million when no profits had been generated from the L3 Income Fund's investments and the L3 loans had not been repaid**.

148. Meanwhile, the approximate 100 L3 Income Fund investors had to share $16.8 million, as the three partners (two of whom did not invest any of their own money) divvied up $24.6 million.

149. Interestingly, on May 22, 2023, Feingold and Dazzo filed an Application for Emergency Interim Measures (the "Application") in a AAA Arbitration.[23]  In the Application, Feingold and Dazzo allege that Cardinale "misappropriated" or "lost" $25 million from one of the Alternative Global entities.

150. It makes sense that Feingold and Dazzo would know that $25 million is missing from one of the Alternative Global entities since the bank records show that $24.6 million of the money AG1 received from the Samson investment went directly into Feingold, Dazzo and Cardinale's pocket.

---

[22] Five million of this distribution came directly out of AG1 from the money it received from the Samson investment.  The rest were distributions from AGM which collected money from all the AG Entities including AG1.

[23] In re: Dissolution of Alternative Global Management, LLC, AAA Case No. 01-23-0002-2987.

151.     After Feingold and Dazzo left, Cardinale sent another $15 million back to the L3 Income Fund to make distributions to the L3 Investors.[24]

152.     As a result of all these distributions there does not appear to be much money left in the L3 Income Fund's Samson portfolios.

153.     For instance, during the week of April 15, 2024, the outstanding balance owed to the L3 Income Fund was around $26 million, however only approximately 18% of the MCA accounts made their weekly payment.  The weekly payments made during that week totaled $71,885.25.  Assuming that is the average collected every week that would mean over the course of the next year (i.e. 52 weeks) Samson could collect approximately $3.7 million for the L3 Income Fund.  Since MCA loans are on average 10-month to 12-month loans, if the L3 Income Fund told Samson to stop reinvesting its money in new MCA loans, then by the time the accounts that are still making weekly payments are fully repaid, the L3 Income Fund could probably withdraw somewhere between $3 million to $4 million within the next year.

154.     That might be enough to make up the current $3.5 million deficit on this investment, but not enough to justify paying the three partners $24.6 million of the money collected or calling the distributions to the L3 Investors interest payments.[25]

### 2.     Blackstream

155.     AG2, AG4, and AG5 invested $17,561,300.00 with Blackstream, a South Carolina based land infrastructure company.  The managers of Blackstream are Ford Elliot, Carlos Salgado, and Josh Howard ("**Blackstream Principals**").

---

[24] Almost ten million dollars of this distribution came directly out the money AG1 received from Samson.

[25] The SEC recently analyzed the recovery rate on bad debts in Samson portfolios and found it to be 3.5 percent.  If the SEC's numbers are correct, then only approximately $800K of the remaining $22 million outstanding balance will ever be recovered.

156.    AG2, AG4, and AG5 agreed to be a joint venturer with Blackstream in special purpose vehicles for seven real estate projects and two Culver's fast-food restaurant franchises. The special purpose vehicles identified to-date are: Wilson Bridge Development, LLC ("**Wilson Bridge**"), Gap Creek Group, LLC ("**Gap Creek**"), Standing Springs Land Development, LLC ("**Standing Springs**"), Hyatt Street Holdings, LLC ("**Hyatt Street**"), HuntsBridge Holdings, LLC ("**HuntsBridge**"), Anderson Ridge Development, LLC ("**Anderson Ridge**"), Woodruff 101 Development, LLC ("**Woodruff**"), Century Restaurant Group I, LLC ("**Restaurant I**"), and Century Restaurant Group II, LLC ("**Restaurant II**") (collectively, "**Blackstream-AG SPVs**").[26]

157.    Feingold made, directed, and managed all the investments with Blackstream and the Blackstream-AG SPVs.

158.    Unbeknownst to the L3 Investors at the time, upon information and belief, Feingold and/or the Baldassarra brothers hold direct or indirect undisclosed equity, control, or other financial interests in Blackstream and/or the Blackstream Projects.

159.    To this day, L3 Investors have not received any return from their investment in Blackstream. Blackstream has refused to answer questions about the current state of L3 Income Fund's investment or provide any details about what happened to the over $17 million L3 Investors invested in Blackstream. Upon information and belief, Blackstream and the Blackstream Principals are controlled by and taking direction from Feingold as it relates to the L3 Investments.

160.    However, on January 17, 2023, BSNY filed an interpleader action claiming that it is in possession of money from Blackstream that belongs to the L3 Income Fund and the L3 Investors. See BSNY Interpleader Complaint at **Exhibit F**.

---

[26] The "**Blackstream SPVs**" are, collectively, the Blackstream Hotel SPVs and the Blackstream AG SPVs.

161.     Further, on January 13, 2025, Broadstreet Fund sued 43 L3 Investors in South Carolina seeking a declaratory judgment that L3 Investors cannot recover from Broadstreet.  Yet in the same Complaint Broadstreet Fund claims that "[a]pproximately $18 million is expected to be paid to [L3 Income Fund and the L3 Investors from their investment in Blackstream] from real estate deals.  That money is for real estate deals which are all operating and in full compliance with no defaults."  See Paragraph 63 of Broadstreet Fund Investor Complaint attached as **Exhibit G**.

162.     Finally, on August 2023, BSG Management sent out an offer letter to Cardinale's attorneys stating that:

> If Mr. Cardinale immediately resigns from all of his L3 related entities and appoints BSGM as sole Manager then BSGM will guarantee with cash/cash collateral that: (a) all investors in the L3 Capital Income Fund will receive their net capital account and thereby be made whole on their investment, (b) all investors in the L3 Hotel Fund will have their names put on the deeds and operating agreements of every hotel related to said fund, and (c) all members of the L3 Special Opportunity Fund will have their names put on the deeds of each parcel of land related to said fund. **This makes all investors whole, plain and simple**.  Mr. Cardinale and his family will not be included in the reimbursement of the capital accounts or placed on any deeds.

See August 10, 2023 Letter at **Exhibit H**.

163.     How does Broadstreet Fund know about the status of L3 Income Fund's investment in Blackstream?  Why does BSNY claim it is in possession of L3 Income Fund's investment in Blackstream?  Why is BSG Management claiming that it can make all the L3 Investors whole?

164.     The answer is simple.  Broadstreet has hijacked L3 Income Fund and L3 Investors' investment in Blackstream and has prevented those funds from returning to the L3 Income Fund and the L3 Investors.

### 3.      Durham Homes

165.      AG6 advanced $5,995,000.00 to Durham Homes, a South Carolina homebuilder, under a Revolving Note and Security Agreement ("**Durham Homes Note**") and a Joint Venture Agreement for Home Building ("**Durham Homes JV**").

166.      The Durham Homes Note entitled AG6 to 15% annual interest paid either on the first of each month or upon the closing date of each home if AG6's funds were used for homebuilding.  The Durham Homes JV entitled AG6 to 50% of the profits generated from any home sales or lot sales, with payments due at the closing of each sale.  Further, to protect AG6's interests from dilution, the Durham Homes JV prohibits Durham Homes from borrowing money, encumbering assets, or entering any financial arrangement without AG6's express written consent.

167.      While Dazzo signed the documents on AG6's behalf, Feingold orchestrated the relationship between AG6 and Durham Homes.  Indeed, he personally drafted the Durham Homes Note and Durham Homes JV and held himself out as acting in the best interest of AG6, the L3 Income Fund, and the L3 Investors.

168.      Unbeknownst to the L3 Investors at the time, JDS—an entity owned by Feingold and the Baldassarras—was at all times the majority member of Durham Homes.  Feingold, through JDS, functionally controlled all financial decision-making for Durham Homes.

169.      On June 20, 2024, Durham Homes filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.[27]  In the Durham Homes Bankruptcy, Durham Homes identified the Feingold Office as the "nerve center" of its business operations.

---

[27] *In re Durham Homes USA, LLC*, No. 24-16133-EPK (Bankr. S.D. Fla.) ("**Durham Homes Bankruptcy**").

170.     Through the Durham Homes Bankruptcy proceeding, it was revealed that Broadstreet had usurped AG 6's role in the investment, and JDS (owned by the same principals at Broadstreet – Feingold and the Baldassarra Brothers) had directed Durham Homes to send money that should have been going to L3 Income Fund to Broadstreet instead.  As a result, L3 Income Fund and the L3 Investors were deprived of the income stream from their Durham Homes investment for over three years.

171.     In addition, as a result of Feingold's, Dazzo's, and the Baldassarra Brothers' misconduct, AG 6 was required to spend a significant amount of attorneys' fees and eventually compromise its position in order to recover from Durham Homes.

172.     As set forth in the Settlement Agreement approved in the Durham Homes bankruptcy, AG 6 will receive $12.5 million from Durham Homes paid out in installments over the next 3 ¾ years. See In re: Durham Homes USA, LLC, Case No. 24-16133-EPK (Bankr. S.D. Fla.) (Doc. 378).  In the Settlement Agreement, AG 6 specifically did not release Feingold, Dazzo, the Broadstreet Entities, or JDS.  Id.

### 4.     The DCGs

173.     AG3 invested $3,939,925.60 in the DCGs, six Florida LLCs that were investment vehicles for a joint venture debt settlement business ("**Debt Settlement Business**").  Dazzo managed the DCGs and the DCGs principal address, mailing address, and registered agent address were, at all relevant times, Dazzo's residence in Palmetto Bay, Florida.  Cardinale was also one of the founders of the DCGs.

174.     The Debt Settlement Business was comprised of: (i) the DCGs, which raised capital; (ii) Consumer Law Relief, LLC d/b/a Helbing Law, LLC, a Pennsylvania law firm that contracted with clients to provide debt settlement services; (iii) CLR Admin Services, LLC

("**CLR**"), a Nevada LLC operating exclusively in Boca Raton, Florida that provided all back office support services for Helbing Law; and (iv) DRM Marketing, LLC ("**DRM**"), which marketed the debt settlement business to consumers.  CLR, which operates in Boca Raton, Florida, is the true center of the Debt Settlement Business and controls its operations.[28]  All funds flow through CLR.

175.    On January 23, 2024, four of CLR's members (including Dazzo but not Cardinale) caused the DCGs to file voluntary Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.[29]  Dazzo acted as the DCGs' authorized representative at their § 341 Meeting of Creditors.

176.    Then, on June 20, 2024—the same day that Durham Homes filed for bankruptcy— CLR also filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.[30]  For several months, CLR and Durham Homes were also represented by the same counsel.

177.    Soon after the DCGs filed bankruptcy, AG3 stopped receiving distributions.

178.    Upon information and belief, the four remaining members of CLR, including Dazzo, used funds of the Debt Settlement Business to start a new debt settlement operation in which neither AG3 nor the L3 Income Fund had an interest.  The Plaintiffs do not know whether Broadstreet has an interest in the new debt settlement business.

179.    To this day, the DCGs are the only L3 Income Fund investment that repaid their loan in full.  Specifically, over the course of two years the DCGs repaid AG3 with $4,598,416.10 from the $3,939,925.60 it borrowed from AG3.  That averages out to an 8% annual profit, which

---

[28] L3 Manager and an entity owned by Dazzo are two of the six members of CLR.
[29] The DCG bankruptcy cases are all jointly administered under *In re DCG Boca, LLC*, No. 24-10601-EPK (Bankr. S.D. Fla.) ("**DCGs Bankr.**").
[30] *In re CLR Admin Services, LLC*, No. 24-16135-EPK (Bankr. S.D. Fla.) ("**CLR Bankr.**").

would not have been enough to cover the 12% to 15% annual distributions promised to L3 Income Fund or the L3 Investors.

**C.** *Feingold, Dazzo and Cardinale Made Improper and Undisclosed Distributions to Themselves.*

180. Feingold, Dazzo and Cardinale set up a system to hide the $24.6 million they siphoned away from the L3 Income Fund.

181. Between November 2019 and January 2022, Feingold directed and/or authorized payments to himself and/or companies that he owned and controlled in the amount of $6.8 million directly from the L3 Income Fund's assets. Specifically, Feingold received this money through distributions to the following entities under his control: MCA Venture I LLC, E Consulting Global Group, Feingold LLC, Feingold et al closing, Feingold Morgan Sanchez. Each of these entities have received substantial illicit proceeds from Feingold's fraud to which they have no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.[31]

182. Between November 2019 and April 2022, Dazzo directed and/or authorized payments to himself and/or companies that he owned and controlled in the amount of $10.3 million directly from the L3 Income Fund's assets. Specifically, Dazzo received this money through distributions to the following entities under his control: Ameritech Global Ventures and DZ Squared LLC. Each of these entities have received substantial illicit proceeds from Dazzo's fraud to which they have no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.

---

[31] Further, upon information and belief Feingold through his company Davick Capital received an additional $3.2 million to $7.7 million directly from Samson for L3 Income Fund's investment.

183.	Between November 2019 and June 2022, Cardinale received approximately $7.5 million through distributions to the following entities under his control: RVCSI, L3 Management and L3 Advisors.  Each of these entities have received substantial illicit proceeds from Cardinale's fraud to which they have no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.[32]

184.	Feingold, Dazzo and Cardinale siphoned away $24.6 million from the L3 Income Fund in different ways.[33]

185.	Sometimes they would immediately take 30% of any money the L3 Income Fund allocated for an investment before the money ever made it to the investment.  For instance, of the $27.7 million that the L3 Income Fund distributed to AG2 and AG4 to make investments in Blackstream and Samson, only $19.6 million ever made it to Blackstream or Samson.  Feingold, Dazzo and Cardinale immediately chopped up 30% or $8.1 million before the money ever made it to Blackstream or Samson.

---

[32] Cardinale has testified in depositions that approximately $700,000.00 of this money went to Titan Communications, a company owned by Todd Sanders and Daniel Amaniera (partners at Broadstreet Inc.) for its fund-raising efforts.  Also, it appears that approximately, $1.6 million of the money Cardinale received was the 2% acquisition fee owed to the L3 Capital Advisors and L3 Capital Management as the Manager of the L3 Income Fund pursuant to the PPM and Operating Agreement.  Cardinale also claims that since Feingold and Dazzo's resignation he has used his own money to fund several litigations with Feingold and Dazzo over the L3 Funds' assets.  Presumable, Cardinale used some of the money he received from the L3 Funds to finance these lawsuits.

[33] Though the Plaintiffs in this action have not had access to the bank records for the L3 Hotel Fund and the L3 Special Opportunity Fund, according to Cardinale's May 15, 2025 filing in Broadstreet New York, Inc. v. L3 Capital Income Fund, LLC, Index No. 650218/2023 [Sup Ct, NY County 2023], Feingold, Dazzo and Cardinale collectively siphoned away $33 million directly from all three of the L3 Funds – almost $13 million to Feingold, almost $10 million to Dazzo and in excess of $10 million to Cardinale.  Again, we believe that Feingold secretly received $3.2 million to $7.7 million directly from Samson for L3 Income Fund's investment in addition to the almost $13 million he received from the L3 Funds.

186. At other times, they would funnel the L3 Income Fund's money through an investment and take approximately 30% when money came out of the investment regardless of whether the investment was making or losing money or if that money was simply a return of the original capital invested. For instance, the entire $4.6 million the DCGs distributed to AG3 to repay the L3 Income Fund was transferred to AGM where Feingold, Dazzo and Cardinale distributed approximately 30% of this money to themselves despite the investment only making a cumulative 17% profit.

187. Feingold, Dazzo and Cardinale used AGM to collect money from any of the investments that were generating money.

188. Specifically, AGM collected $28,220,871.82 from the Samson investment (AG1); $4,996,400.00 from the 30% immediately taken before the money could get to the Blackstream and Samson investments (AG2); $4,598,166.10 from the DCG Entities investment (AG3); $2,594,500.00 from the 30% immediately taken before the money could get to the Blackstream and Samson investments (AG4); $31,007.19 immediately taken before the money could get to the Blackstream and Culvers investments (AG5); and $532,500.00 consisting of the only two payments ever received from the Durham Homes investment (AG6).

189. In all, AGM collected approximately $41 million from the L3 Capital Income Fund's investments.

190. Almost $17 million of this money was sent back to L3 Capital Income Fund presumably to make distributions to and redemptions for the L3 Investors.

191. The remaining $24.6 million was distributed to Feingold, Dazzo and Cardinale.

192.    Notably, Feingold, Dazzo and Cardinale began taking a 30% distribution within months of the L3 Income Fund being formed.[34]  Thus, it is evident that they had planned to take these 30% distributions from the very beginning and could have disclosed their intent to the L3 Investors prior to soliciting their investment but did not.

193.    Feingold, Dazzo and Cardinale amended the L3 Income Fund's PPM and Operating Agreement in October 2020 and still didn't disclose that they were taking 30% of the L3 Investors' money for themselves even though by then they had already been pocketing 30% of the money for the past 6 months.[35]

194.    Upon information and belief, from October 2019 through July 2020, Feingold, Dazzo and Cardinale created AGM and AG1-6 for the sole purpose of hiding the distributions they planned to take from the L3 Funds and to defraud and or mislead the L3 Investors about how their funds would be utilized.

195.    Further proof of this is the fact that Feingold, Dazzo and Cardinale didn't disclose the existence of AG1-6 or AGM in the amended PPM or Operating Agreement even though these investment entities had all been created and were being funded by October 2020.

196.    Feingold, Dazzo and Cardinale have engaged in extensive lawsuits against one another over the $5.9 million invested in Durham Homes, the $17.5 million invested in Blackstream, or the value of their interest in AGM or the AG1-6 Entities, but none of the pleadings

---

[34] The bank records for AGM, AG1-6 and L3 Income Fund, as well as Dazzo's handwritten notes from September 2020 and October 2020 reflect 30% distributions to Feingold, Dazzo and Cardinale.

[35] Interestingly, in July 2023 Broadstreet sent its investors a Compliance Acknowledgement Update where they attempted to get its investors to acknowledge, after their investment had already been made, that Broadstreet could pay itself upfront 30% in fees.  No such efforts to disclose the 30% that Feingold, Dazzo and Cardinale were taking from the L3 Income Fund was ever made to the L3 Investors.

seeking to recover the $24.6 million that they siphoned away from the L3 Income Fund and the L3 Investors.

197. The immediate removal of this $24.6 million made it impossible for the L3 Income Fund to make a return on its investments. Before it could ever turn a profit, the L3 Income Fund would have to dig itself out of a $24.6 million dollar hole.

198. The three partners secretly paid themselves $24.6 million while the L3 Investors lost and are still losing the money they invested in the L3 Funds.

199. For this reason, none of the three partners can be trusted to return whatever money they recover in their lawsuits to the L3 Investors.

### D.      *Where did the L3 Income Fund money go?*

200. The L3 Income Fund raised just over $81 million from approximately 100 investors. As of August 2024, the Plaintiffs uncovered that of the $81 million raised for the L3 Income Fund:

- Approximately $24.6 million or 30% of it ultimately made its way to business entities owned or controlled by Feingold, Dazzo and Cardinale;

- Approximately $30.4 million of it was given back to the L3 Investors in alleged interest distributions or redemptions. However, the Plaintiffs' investigation has revealed that the L3 Income Fund investments made little to no money, thus the alleged interest distributions were actually a return of the L3 Investors initial capital;

- Approximately $17.5 million was distributed to Blackstream, who it appears from all the court filings is refusing to distribute that money back to the L3 Income Fund or provide the L3 Income Fund with any information about the

49

status of its investment. Further, based on several court filings it appears Broadstreet is in control of the $17.5 million the L3 Income Fund gave to Blackstream and Broadstreet is, at least in part, responsible for preventing the L3 Income Fund from getting its money out of Blackstream;

- Approximately $5.9 million was distributed to Durham Homes, who has since filed bankruptcy and has agreed to pay back $12 million to the L3 Income Fund over the next 4 years; and

- Approximate $3.5 million are losses from L3 Income Fund's investment in Samson.

201. These numbers add up to $81.3 million. This explains why the L3 Income Fund stopped paying distributions in April 2023. It simply ran out money.

202. Of the approximate $32 million that was transferred back to the L3 Income Fund ($17 million from AGM and $15 million from Samson/AG1), $30.4 million made it back to the L3 Investors. Some of this money was in the form of redemptions, but the vast majority of it was sent to the L3 Investors as interest payments.

203. In other words, the L3 Investors were told that the money they were receiving was profits from their L3 Investments. However, as discussed in detail above, the L3 Investments collectively have not made a profit. So, the distribution that the L3 Investors have been receiving was only a return of their initial capital.

204. Feingold, Dazzo and Cardinale through L3 Income Fund have issued Schedule K-1 Forms to the L3 Investors showing that the distributions they received are interest income, and that their capital accounts in the L3 Income Fund are still at the same amount as their initial investment or more if they elected to reinvest their distributions.

205. As a result of this mischaracterization of the distributions they were receiving, the L3 Investors have paid taxes on what they were told was interest income.

206. Also, many of the L3 Investors are retirees who made these investments to generate income for their retirements. But now they are not receiving the income that was promised and cannot move their money away to a different income-generating investment.

207. Moreover, because distributions from the L3 Income Fund have stopped and what really happened to their money is not being disclosed, some of the L3 Investors are being penalized by the IRS because they have not been able to take their required minimum distributions out of their IRA accounts.

208. Whether Feingold, Dazzo or Cardinale negligently mismanaged the L3 Funds or they intentionally perpetrated a fraud to steal the L3 Assets, it is the L3 Investors who are ultimately being harmed by Feingold, Dazzo and Cardinale's actions.

## IV.    FEINGOLD MASTERMINDS THE DECEPTIVE AND UNFAIR CIVIL CONSPIRACY

209. Feingold teamed up with the Baldassarras and their investment fund, Broadstreet, to transfer the L3 Assets into Broadstreet or to otherwise use Broadstreet to invest in the same projects as the L3 Funds, thus intentionally diluting the L3 Assets' value to the benefit of Broadstreet. In short, Feingold, Dazzo, the Baldassarras, and Broadstreet concocted a plan to deprive the L3 Investors of the value of their investments.

210. Beginning at least as early as August 2021, while they were Managing members of AG1-6, Feingold and Dazzo began flying investors and investment advisors to Greenville, South Carolina on Feingold's private jet, to solicit investments in Broadstreet, many of whom were

already investors in the L3 Funds.[36]  Initially, some investors in the L3 Funds were told that the trip would allow them to receive updates on the status of their investments.  But when they arrived, Feingold, joined by Dazzo and the Baldassarras, solicited the investors with opportunities to invest in Broadstreet.

211.    Feingold and Broadstreet were intentionally vague about Broadstreet's relationship (or lack thereof) to the L3 Funds and deceptively portrayed these investments as "new" investments by Broadstreet, and that Broadstreet was an "affiliate", "related to", the "sister company" or a "continuation of" the L3 Funds.  Instead, the investments Feingold, Dazzo, and the Baldassarras pitched to investors were interests that Feingold and Dazzo had simply stolen (or intended to steal) from the L3 Investments and transferred to Broadstreet.

212.    To the extent Broadstreet's solicitation was not based on stolen/misappropriated assets, it was based on investments that Feingold, Dazzo, and the Baldassarras knew wrongfully (i) diluted the L3 Assets; and (ii) breached the L3 Funds and AG 1-6's agreements with the Investment Companies all of which Feingold and Dazzo had personally orchestrated, drafted, signed, and managed.

213.    For example, effective as of September 1, 2021, Broadstreet entered a loan agreement with Durham Homes that subverted AG6's relationship with Durham Homes.  Feingold was able to accomplish this simply because he and the Baldassarras, through JDS, are the majority members of Durham Homes and were responsible for all financial decisions of Durham Homes.

214.    By at least mid-September 2021, Broadstreet began inviting investors into its data room, which included information about the L3 Assets.

---

[36] Upon information and belief, Feingold's jet was purchased or leased with money from the L3 Funds.

215.     Based on these representations, numerous investors in the L3 Funds were deceived to invest twice in the same assets, effectively "double dipping."

216.     In court filings, Cardinale claims that he began to uncover Feingold and Dazzo's deceptive and unfair acts in December 2021, when he traveled to South Carolina and witnessed first-hand Feingold soliciting investors to invest in Broadstreet by selling the L3 Assets or, at the very least, opportunities that would necessarily dilute the L3 Assets or disrupt the L3 Funds' and AG 1-6's relationships with the Investment Companies.

217.     According to Cardinale, after he saw that Feingold and Dazzo were pitching the same investments under Broadstreet, he demanded an explanation, which they never provided. Then, Cardinale demanded more detailed information about the status of AG 1-6 and their various investments.  Feingold and Dazzo—knowing such documents would expose their deceptive and unfair efforts to rob the L3 Funds and the L3 Investors for their own personal benefit—refused.

218.     On December 21, 2021, Feingold sent Cardinale a purported valuation of AG 1-6.[37]

219.     On January 5, 2022, at 2:17 am, Cardinale was awakened by a lengthy threatening text from Feingold.  In it, Feingold demanded that Cardinale make "protect[ion]" payments to Feingold, stating that Cardinale "ha[d] benefitted immensely from my work and protection of you and you are going to pay me for that."  Feingold further threatened that he knew his "way around a court room" and, while he "had no interest in ruining [Cardinale]," he "can guarantee that [he] will if it is necessary."[38]

---

[37] See Email dated December 21, 2021 from Feingold to Cardinale attached as **Exhibit I**.

[38] See Text message dated January 5, 2022 from Feingold to Cardinale attached as **Exhibit J**.

220.    Shortly thereafter, Feingold demanded that Cardinale buy him and Dazzo out of their interests in AG 1-6 for $25 million.  Feingold had no basis to make such a demand, especially because AG 1-6 exist solely to serve the financial interests of the L3 Capital Income Fund, L3 Investors, and—if there are any excess profits—AGM.  AG 1-6 is not entitled to any of its funds, meaning the inherent monetary value of membership in AG 1-6 is $0.00 regardless of the success of their investments.  Feingold's buyout demand is emblematic of his goal of misusing AG 1-6 to line his own pockets rather than operate them for the benefit of the L3 Investors.

221.    Cardinale refused Feingold's baseless buyout demand.  It would not have been in the best interest of the L3 Investors to buy out Feingold and Dazzo's monetarily worthless interests in AG 1-6 for $25 million.

222.    On January 28, 2022, Feingold and Dazzo served Cardinale with a notice of resignation stating that "Mr. David Feingold and Mr. Michael Dazzo, effective immediate, *resign as managers and members* of [AG 1-6]" and, based on such resignation, demand "fair value for their interests" under 6 Del. C. § 18-604, a Delaware statute that provides resigning members of an LLC with the right to demand fair value for their resigned interest from the LLC.  Feingold and Dazzo further confirmed that their resignations made Cardinale AG 1-6's sole managing member.

223.    According to Cardinale, after Feingold and Dazzo resigned, they absconded with AG 1-6's books and records and refused to turn them over upon demand.  These books and records included, among other things, (i) financial information, (ii) contracts and agreements, (iii) management documents, (iv) documents concerning AG 1-6's relationships with the Investment Companies; (v) the terms and conditions of AG 1-6's relationships with the Investment Companies; (vi) the Investment Companies activities and expenditures related to AG 1-6's

investments; and (vii) the progress of returns on AG 1-6's investments on behalf of the Investment Companies.

224.    At the same time, Feingold and Dazzo colluded with the Investment Companies - Samson Horus, Blackstream, the Blackstream SPVs, the DCGs, and Durham Homes - to make sure that the L3 Funds could not obtain records from other sources.  When AG 1-6 and the L3 Funds requested documents from the Investment Companies—which were owned, controlled, or influenced by Feingold and Dazzo—they rebuked and/or ignored the document requests.

225.    Feingold and Dazzo's refusal and interference—both deceptive and unfair tactics— left the L3 Funds unable to account for the L3 Assets, much less make sure that they were adequately protected and continue to report on the status of the L3 Assets to the L3 Investors.

226.    During this period where the L3 Funds had no visibility into the L3 Assets, the Defendants conspired to transfer many of the L3 Assets out of the names of the L3 Funds and AG 1-6 and into the name(s) of Broadstreet and other entities in which the Feingold, Dazzo, and the Baldassarras hold interests.[39]

227.    In June 2022, Feingold became the CEO of BSI and Dazzo became the Senior Managing Director of BSI.  At that point, any potential doubt as to the collusion amongst Feingold, Dazzo, the Baldassarras, and Broadstreet was put to rest.

---

[39] Plaintiffs have also learned that, in some instances, Feingold and Dazzo identified the party who owned the L3 Assets purchased by AG 1-6 not as one of the AG 1-6 entities, but as an entity called "Alternative Global Partners, LLC."  Plaintiffs are not aware of any entity called Alternative Global Partners, LLC, and Feingold and Dazzo's purchase of these interests using that name does not change the Plaintiffs' rights and interests in those assets.  Any investments made in the name of "Alternative Global Partners, LLC" are investments owned by the specific Alternative Numbered Entity that made the investment from monies borrowed from the L3 Income Fund.

228.    In short, since at least August 2021 through the present, Feingold, Dazzo, the Baldassarras, and Broadstreet have conspired to deceptively and unfairly hijack the L3 Assets to harm the L3 Investors and line their own pockets with ill-gotten and illegally obtained gains.

229.    Feingold and Broadstreet have admitted that Broadstreet is improperly holding the L3 Investments on three separate occasions.

230.    First, on January 17, 2023, Broadstreet NY filed this interpleader action naming the L3 Income Fund and AGM as defendants. In this action, Broadstreet NY—a self-described "affiliate" of BSI controlled by Feingold—acknowledged that that it is holding at least some of the L3 Investments and that it will be receiving monies from those L3 Investments over the next five years. [NYSCEF Doc. No. 2.]

231.    Over Broadstreet NY's objection, AG 2, 4, and 5 were permitted to intervene in the Broadstreet NY Interpleader action. [NYSSEN Doc. No. 106.]

232.    On March 8, 2023, Feingold signed an Affidavit under oath, stating:

> … Broadstreet NY and/or its related entities are prepared to redeem every investor in the [L3 Income Fund] based upon their adjusted cost basis on their [L3 Income Fund] Schedule K-1's **provided that Cardinale** (both individually and through any entity in which he controls said fund) **immediately steps down as Manager and appoints Broad Street NY as the new Manager**.  This offer was previously made and remains open.

[Nyssen Doc. No. 54, at ℙ 26.] This statement was false and misleading to L3 Investors in many respects. Among other things, this offer had never been previously made and was not an open offer. Moreover, it was never explained by Feingold or any of the Defendants why, or what monies/assets Broadstreet would use to redeem L3 Investors. In fact, it appears that Broadstreet simply offered to give the L3 Investors back what they were already entitled to, and at a discount.

233.    In August 2023, Broadstreet sent two letters: one from BSG Management's counsel (the same counsel to Broadstreet NY in this interpleader action) to Cardinale's counsel, and another

on Broadstreet Fund's letterhead to "Investors of the L3 related entities" (collectively, the "**Broadstreet Guarantee Letters**"). In the Broadstreet Guarantee Letters, Broadstreet falsely agreed to make the L3 investors "whole" if and only if Cardinale agreed to "immediately resign[]" as manager of the L3 Funds and "appoint[] BSGM as sole Manager" of the L3 Funds. The Broadstreet Guarantee Letters falsely defined making the L3 investors "whole" as simply returning the remaining net amount that they invested in the L3 Income Fund, or putting the investors names on deeds and operating agreements of the hotels and outparcels. This proposed offer does not make investors "whole." The L3 Investors invested in and are entitled to receive the full amount of their principal, plus interest, and, where applicable, a profit return on their investments with the L3 Funds.

234. To be clear: the BSG Guarantee Letters are an express threat to withhold the L3 Investors' rights and interests unless Cardinale and L3 Manager resigned from the L3 Funds and appointed BSG Management as the L3 Funds' sole manager, and unless the L3 investors accepted less than the full benefit of their bargain as sufficient to make them "whole" on their investments.

235. In August 2023, Cardinale, through L3 Manager, disclosed the BSG Guarantee Letters and its terms to the L3 investors and explained that it would be inappropriate to accept its terms, especially on less than 24-hours' notice given all the facts and circumstances:

> Given that these past 18 months of litigation were initiated by David Feingold and Michael Dazzo, who are now the CEO and Senior Managing Director of Broad Street, and that they have steadfastly refused to account for their use of the funds these past 18 months, make a return on the investments, or provide information about the title and status of the various investments, I cannot, as a fiduciary, blindly "turn over" management to their company. 18 months ago, when I refused to pay Mr. Feingold millions of more dollars, over and above the millions of dollars that he had already received, he threatened to bring all of the investors into litigation – stating "frankly I really don't care" and "nor do I have any relationship with those investors."

57

(The Broadstreet Guarantee Letters and L3 Income Fund's responses are attached hereto as Composite Exhibit 4.) This letter response was based, in part, on the "past 18 months of litigation," meaning the 18 months before August 2023. Feingold, Dazzo, and Cardinale have now been in litigation for more than 3 years (since January 2022), but Broadstreet is not a party to any of those actions.

236.    Since the Broadstreet Guarantee Letters, several attempts have been made to obtain information and/or recover the L3 Investments, including the L3 Manager's demand letter, dated October 24, 2024, which was reviewed, approved, and signed by counsel for the L3 Funds, the L3 Manager, and several L3 investors and sent to Feingold and Dazzo, stating as follows:

> … On behalf of the investors in the L3 Funds, the Manager hereby provides written confirmation of ongoing demands that you or entities you own or control immediately return to the investors the current outstanding balance due to the investors of the L3 Funds as follows:

| L3 Fund | Outstanding Investment Amt. | Interest Owed | Total Owed |
|---|---|---|---|
| Income Fund | $79,094,089 | $23,087,137 | $102,181,226 |
| Hotel Fund | $47,100,000 | $1,912,500 | $49,012,500 |
| Special Op Fund | $17,000,000 | $- | $17,000,000 |
| | | | Total: $168,193,726 |

> To eliminate feigned concerns you have raised as to whether these monies will be paid directly to investors in the L3 Funds, the Manager has agreed to deposit such funds in the escrow account of independent fund counsel, Deborah S. Corbishley, Kenny Nachwalter, P.A., Four Seasons Tower, 1441 Brickell Avenue, Suite 1100, Miami, FL 33131, pursuant to an Escrow Agreement wherein any monies received from you (or entities you own or control) are to be distributed directly to investors in direct correlation to each investor's ownership interest in the L3 Funds.

> All investors will be treated equally in accordance with their membership interest, except that I (Richard Cardinale and any entities that I own or control) will not receive a return of my investment in the L3 Funds, neither principal nor interest, nor a payment of any kind from such escrowed funds, unless and until after all investors are first paid back in full.

> As you know, the Manager has not been taking any management fees, and no person or entity (other than the escrow agent) will receive any management fees or a fee

of any kind in connection with the administration of any monies in the escrow account.

Please note this demand is being sent without waiver of or prejudice to any and all of the L3 Funds' rights and remedies, all of which are expressly reserved.

ON BEHALF OF THE INVESTORS IN THE L3 FUNDS, WE WELCOME THE OPPORTUNITY TO MUTUALLY AGREE ON THE DETAILS OF HOW TO RETURN MONIES DIRECTLY TO THE INVESTORS AS QUICKLY AS POSSIBLE.

Demand Letter, attached hereto as **Exhibit K**.

237.    Neither Feingold, Dazzo, nor any of the other Defendants have ever responded to this Demand, yet Broadstreet continues to assert it owns, manages, or controls several L3 Investments, and Broadstreet continues to claim that it somehow knows, but will not disclose to the L3 Funds, the amount of proceeds the L3 Funds' have received or will receive in the future from their L3 Investments.

238.    Indeed, on January 13, 2025, Broadstreet Fund sued forty-three L3 Investors in South Carolina seeking a declaratory judgment that L3 Investors cannot recover from Broadstreet. Broadstreet Global Fund v. Perry A. Harris et al., Case No. 2025CP2300210 (S.C. 13th Cir.).  Yet in the same Complaint, Broadstreet Fund asserts, among other things, that "[a]pproximately $18 million is expected to be paid to [L3 Income Fund and the L3 Investors from their investment in Blackstream] from real estate [infrastructure] deals.  That money is for real estate [infrastructure] deals which are all operating and in full compliance with no defaults."

239.    The Broadstreet Fund's allegation shows that it has knowledge of the status of the L3 Investments and further confirms its misappropriation of the L3 Investments.  Broadstreet NY has admitted that it or "its affiliates" are in possession or control of L3 Fund investments.  BSG Management has falsely "guaranteed" that it can make all the L3 Investors "whole" by paying their "net" capital account, or by putting investors names on deed.  All of these circumstances show

59

that Broadstreet has hijacked the L3 Investment and has prevented those investments or any proceeds from being returned to their rightful owners, the L3 Funds, and ultimately the L3 Investors.

**COUNT I**
**SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78J AND**
**RULE 10B-5, 17 C.F.R. § 240.10B-5**
**Plaintiffs v. Feingold, Dazzo and Cardinale**

240. The proponents of this cause of action repeat and reallege paragraphs 1-239.

241. Feingold, Dazzo and Cardinale, by the use of means and instrumentalities of interstate commerce (i.e., mails and wire transfers), were primary participants in the following wrongful conduct and they each:

a. Employed devices, schemes, and artifices that were intended to and did defraud Plaintiffs;

b. Made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading;

c. Engaged in acts, practices and a course of business which operated as a fraud and deceit upon purchasers of membership interest in the L3 Funds,

in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j and 78t) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

242. Feingold, Dazzo and Cardinale employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to L3 Investors relating to their intentions on how the funds raised would be used inducing L3 Investors to invest over $150 million into the L3 Funds.

243. Feingold, Dazzo and Cardinale disseminated or approved the materially false and misleading representations to L3 Investors described herein, which they knew or deliberately

60

disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the representations made, in light of the circumstances under which they were made, not misleading.

244.    Through their verbal and written representations to L3 Investors regarding the L3 Funds directly or indirectly, by the use of a means or instrumentality of interstate commerce, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

245.    By the use of a means or instrumentality of interstate commerce, Feingold, Dazzo and Cardinale engaged in acts, practices, and a course of business that operated as fraud or deceit upon the L3 Investors.

246.    L3 Investors have suffered injury in that, in reliance on the misrepresentations and/or omission of Feingold, Dazzo and Cardinale and their employees, they invested in the L3 Funds, and only now, years after their investments were made are they learning the truth about the performance of their investments in the L3 Funds and what Feingold, Dazzo and Cardinale had planned to do with the L3 money and assets (i.e. pocket at least 30% for themselves, misrepresent distributions as interest payments, and transfer the L3 assets to Broadstreet).

247.    The L3 Investors did not know that Feingold, Dazzo and Cardinale' statements were untrue and that Feingold, Dazzo and Cardinale omitted material facts.

248.    The L3 Investors would not have invested in the L3 Funds had they been aware that Feingold, Dazzo and Cardinale had made such misrepresentations and/or omissions.

249.    Unaware of the falsity of Feingold, Dazzo and Cardinale's statements and representations concerning the true nature of and their plans for the investments, the L3 Investors,

to their detriment, reasonably relied on those statements and communications described above in investing with the L3 Funds.

250.    Feingold, Dazzo and Cardinale's concealment of this material information served only to harm the L3 Investors in ignorance of the financial risk to them as a result of such nondisclosures.

251.    As a proximate result of Feingold, Dazzo and Cardinale's wrongful conduct alleged herein, the L3 Investors suffered hundreds of millions of dollars in damages in connection with their investments with the L3 Funds.

252.    **WHEREFORE**, Plaintiffs demand judgment against Feingold, Dazzo and Cardinale for compensatory damages, interest, costs, attorneys' fees, and such other relief as the Court deem appropriate and just.

## COUNT II
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Plaintiffs v. Defendants

253.    The proponents of this cause of action repeat and reallege paragraphs 1-239.

254.    Defendants engaged in deceptive and unfair practices by, among other things:

- Intentionally developing obfuscatory investment structures designed to allow Feingold to control the L3 Assets and the L3 Funds' books, records, and other relevant investment documents;

- Intentionally developing obfuscatory investment structures designed to allow Feingold, Dazzo, Cardinale (and potentially others) to pay themselves undisclosed and unfair compensation;

- Disrupting and destroying the relationships and business interests of the L3 Funds and their investment vehicles, including AG 1-6;

- Misappropriating the L3 Assets;

- Misappropriating the L3 Funds;

- Using the investment structure and business operations of the L3 Funds and AG 1-6 to obfuscate such misappropriation and, ultimately, abscond with the books and records of the L3 Funds and AG 1-6;

- Falsely portraying the L3 Assets as belonging to Broadstreet to solicit investments in Broadstreet;

- Diluting or eliminating the value of the L3 Assets;

- Threatening to withhold the L3 Assets in Broadstreet's possession unless Cardinale and L3 Manager agreed to resign and appoint BSGM as the sole Manager of the L3 Funds, and the L3 Investors agreed to accept less than the value of their interests as sufficient to make them "whole".

255.  The above deceptive and unfair practices above caused hundreds of millions of dollars in damages to the proponents of this cause of action.

256.  **WHEREFORE**, based on the above, the proponents of this cause of action demand a judgment holding Defendants liable for their violations of FDUTPA and entitling the proponents of this cause of action to all damages and other relief available under applicable law.

## COUNT III
### FRAUD
#### Plaintiffs v. Defendants

257.  The proponents of this cause of action repeat and reallege paragraphs 1-239.

258.  The Defendants have perpetrated numerous frauds on the Plaintiffs that are continuous and ongoing.

259.  Feingold, Dazzo and Cardinale fraudulently induced L3 Investors to invest in the L3 Funds without disclosing their plan to pocket 30% of the funds raised.

260.  Feingold, Dazzo and Cardinale purposefully created special purpose investment vehicles for the sole purpose of hiding the distributions they planned to take from the L3 Funds and to defraud and or mislead the L3 Investors about how their funds would be utilized.

261.  Feingold, Dazzo and Cardinale amended the L3 Income Fund's PPM and Operating Agreement in October 2020 and still didn't disclose that they were taking 30% of the L3 Investors'

63

money for themselves even though by then they had already been pocketing 30% of the money for the past 6 months

262.     Feingold, Dazzo and Cardinale prepared quarterly statements that misrepresented the performance of the underlying investments in the L3 Funds and how the L3 assets were being used.

263.     Feingold, Dazzo and Cardinale through L3 Income Fund issued Schedule K-1 Forms to L3 Investors misrepresenting the distributions they received as interest income, and that L3 Investors' capital accounts in the L3 Capital Income Fund are still at the same amount as their initial investment or more if they elected to reinvest their distributions.

264.     Feingold—and eventually Dazzo—used their control of AG 1-6 to initiate and ultimately carry out their conspiracy to, through fraudulent, deceptive, and unfair practices, deprive the L3 Income Fund and the L3 Investors of the benefit of their bargain while enriching themselves and their co-conspirators, the Baldassarras Brothers and Broadstreet.

265.     Feingold teamed up with the Baldassarras and their investment fund, Broadstreet, to fraudulently transfer the L3 Assets into Broadstreet or to otherwise use Broadstreet to invest in the same projects as the L3 Funds, thus intentionally diluting the L3 Assets' value to the benefit of Broadstreet.   In short, Feingold, Dazzo, the Baldassarras, and Broadstreet concocted a plan to deprive the L3 Investors of the value of their investments.

266.     **WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants granting all damages and other available relief under applicable law.

**COUNT IV**
**RACKETEERING**
**IN VIOLATION OF 18 U.S.C. § 1964**
**Plaintiffs v. Feingold, Dazzo, the Baldassarras Brothers and Broadstreet**

267.    The proponents of this cause of action repeat and reallege paragraphs 1-239.

268.    Feingold directed and coordinated with Dazzo and the Baldassarras Brothers (collectively the "RICO Enterprise" or "Enterprise") within the meaning of 18 U.S.C. § 1964(4), which Enterprise was engaged in, or the affairs of which affected, interstate commerce.

269.    The RICO Enterprise engaged in a pattern of racketeering activity.

270.    Feingold, Dazzo and the Baldassarras Brothers conspired to systemically transfer many of the L3 Assets out of the names of the L3 Funds and AG 1-6 and into the name(s) of Broadstreet and other entities in which the Feingold, Dazzo, and the Baldassarras hold interests.

271.    They formed business entities to illegally transfer title away from the L3 fund or to dilute L3 Funds' ownership interest in L3 Assets.

272.    They repeated this pattern of behavior over several years repeatedly to gain control of at least seven (7) land infrastructure projects, four (4) hotels, two (2) outparcel commercial real estate development projects, and a home development, spread out across several states and all currently potentially worth hundreds of millions of dollars that ultimately belong to L3 investors, not Broadstreet or any of the Defendants.

273.    Feingold, Dazzo and the Baldassarras Brothers also redirected distributions that should have gone to the L3 Funds from these assets to Broadstreet.

274.    Since at least August 2021 through the present, Feingold, Dazzo, the Baldassarras, and Broadstreet have conspired to deceptively and unfairly hijack the L3 Assets to harm the L3 Investors and line their own pockets with ill-gotten and illegally obtained gains.

275. As co-conspirators, the unlawful conduct of each member of the RICO Enterprise is attributed to every member.

276. **WHEREFORE**, for the foregoing reasons, Feingold, Dazzo, the Baldassarras Brothers and Broadstreet have violated the Racketeer Influenced and Corrupt Organizations Act and are liable to the Plaintiffs for damages, including, statutory treble damages pursuant to 18 U.S.C. § 1964(c), reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), costs, interest and such other and further relief as this Court deems just and proper.

## COUNT V
## <u>NEGLIGENCE</u>
**Plaintiffs v. L3 Manager, L3 Advisors and Cardinale**

277. The proponents of this cause of action repeat and reallege paragraphs 1-239.

278. L3 Manager, L3 Advisors and Cardinale were the managers of the L3 Funds and thus owed a duty to the L3 Funds and the L3 Investors who were members of the L3 Funds.

279. They breached this duty by negligently managing, protecting and investing the L3 Funds assets.

280. Cardinale as the manager for the L3 Funds allowed his partners Feingold and Dazzo to siphon away L3 Assets to themselves and to Broadstreet, failed to monitor the performance of the L3 Funds' investments, and did not maintain all of the books and records relevant to the L3 Funds' investments.

281. The L3 Funds and the L3 Investors have been harmed as a result of this breach of duty.

282. **WHEREFORE**, Plaintiffs demand judgment in their favor and against L3 Manager, L3 Advisors and Cardinale granting all damages and other available relief under applicable law.

**COUNT VI**
**CIVIL CONSPIRACY**
**Plaintiffs v. Defendants**

283. The proponents of this cause of action repeat and reallege paragraphs 1-239.

284. As detailed above, the Defendants engaged in a civil conspiracy to:

- Intentionally developing obfuscatory investment structures designed to allow Feingold to control the L3 Assets and the L3 Funds' books, records, and other relevant investment documents;

- Intentionally developing obfuscatory investment structures designed to allow Feingold, Dazzo, Cardinale (and potentially others) to pay themselves undisclosed and unfair compensation;

- Disrupting and destroying the relationships and business interests of the L3 Funds and their investment vehicles, including AG 1-6;

- Misappropriating the L3 Assets;

- Misappropriating the L3 Funds;

- Using the investment structure and business operations L3 Funds and AG 1-6 to obfuscate such misappropriation and, ultimately, abscond with the books and records of the L3 Funds and AG 1-6;

- Falsely portraying the L3 Assets as belonging to Broadstreet to solicit investments in Broadstreet;

- Diluting or eliminating the value of the L3 Assets;

- threatening to withhold the L3 Assets in Broadstreet's possession unless Cardinale and L3 Manager agreed to resign and appoint BSGM as the sole Manager of the L3 Funds, and the L3 Investors agreed to accept less than the value of their interests as sufficient to make them "whole";

285. The proponents of this cause of action were damaged by the above conspiracy.

286. **WHEREFORE**, the proponents of this cause demand a judgment holding the Defendants liable for civil conspiracy and granting all available relief under the law.

**COUNT VII**
**UNJUST ENRICHMENT**
**Plaintiffs v. Defendants**

287. The proponents of this cause of action repeat and reallege paragraphs 1-239.

288. Here, the L3 Funds and L3 Investors gave approximately $150 million to companies controlled by Feingold, Dazzo and Cardinale to be invested on their behalf.

289. Instead of investing all of this money, Feingold, Dazzo and Cardinale siphoned away at least $24.6 million to bank accounts controlled by them without the L3 Investors' knowledge or permission.

290. Afterwards, Feingold and Dazzo directed the L3 Funds' and L3 Investors' investments be transferred to the Broadstreet without their knowledge or permission and actively blocked the L3 Funds and L3 Investors from receiving a return on their investments.

291. As a result of the Defendants' actions, the L3 Funds and L3 Investors have not had access to capital or distributions from their investments for over two years.

292. Many of the L3 investors are retirees who depend on the income from these investments to survive.

293. The Defendants knowingly accepted and retained the benefits of the money they obtained from the L3 Funds and the L3 Investors knowing that they had not earned the money, the income generated from that money belonged to the L3 Funds and the L3 Investors, and the money held in the investments belonged to the L3 Funds and the L3 Investors.

294. Under the circumstances described herein, it would be inequitable and unfair to allow Defendants to gain or profit from their wrongdoing.

295. Under the circumstances described herein, it would be inequitable and unfair to allow Defendants to retain their economic benefits without paying for them.

68

**WHEREFORE**, the L3 Funds and L3 Investors demand judgment in their favor and against the Defendants granting all damages and other available relief under applicable law.

## COUNT VIII
## CONVERSION
**Plaintiffs v. Defendants**

296.    The proponents of this cause of action repeat and reallege paragraphs 1-239.

297.    The Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over millions of dollars belonging to the L3 Investors, which were invested in the L3 Funds with the expectation and promise of a return on the investments.

298.    The L3 Investors and the L3 Funds have a superior right of possession of the monies and assets held in these investments.

299.    Nonetheless, the Defendants continue to exercise unauthorized dominion over the L3 Funds and L3 Investors' investments to the exclusion and in defiance of the lawful rights of the Plaintiffs to such investments.

300.    Further, Plaintiffs have discovered that Feingold, Dazzo and Cardinale siphoned away at least $24.6 million to bank accounts controlled by them without the L3 Investors' knowledge or permission.

301.    Afterwards, Feingold and Dazzo directed the L3 Funds' and L3 Investors' investments to be transferred to the Broadstreet without their knowledge or permission and actively blocked the L3 Funds and L3 Investors from receiving a return on their investments ("**Converted Properties**").

302.    As a result of these illegal distributions, millions of dollars have been stolen from the Plaintiffs.

303.    Notably, many of the L3 investors are retires who depend on the income from these investments to survive.

69

304.     The Defendants wrongfully assert dominion over the Converted Property in a manner that is inconsistent with the L3 Funds' and L3 Investors' rights to own and possess the Converted Property.

305.     Defendants' wrongful assertion of dominion over the Converted Property deprives the L3 Funds and L3 Investors of their right to own and possess the Converted Property.

306.     **WHEREFORE**, the L3 Funds and L3 Investors demand judgment in their favor and against the Defendants granting all damages and other available relief under applicable law.

## COUNT IX
## CIVIL THEFT
### Plaintiffs v. Feingold and Dazzo

307.     The proponents of this cause of action repeat and reallege paragraphs 1-239.

308.     The L3 Funds and L3 Investors gave approximately $150 million to companies controlled by Defendants Feingold, Dazzo and Cardinale to be invested on their behalf.

309.     Plaintiffs have discovered that instead of investing all this money, Feingold, Dazzo and Cardinale siphoned away at least $24.6 million to bank accounts controlled by them without the L3 Investors' knowledge or permission.

310.     Afterwards, Feingold and Dazzo directed the L3 Funds' and L3 Investors' investments to be transferred to the Broadstreet without their knowledge or permission and actively blocked the L3 Funds and L3 Investors from receiving a return on their investments ("**Stolen Property**").

311.     The Defendants knowingly obtained or used, or endeavored to obtain or use, the Stolen Property.

312.     The Defendants acted with felonious intent.

313.     The Defendants actions were intended to permanently deprive the L3 Funds and L3 Investors of their rights to, and the benefits from, the Stolen Property.

314.     The Defendants' actions were intended to appropriate the Stolen Property for the Defendants' own use.

315.     Notably, many of the L3 investors are retirees who depend on the income from these investments to survive.

316.     Pursuant to Florida Statute § 772.11, on October 22, 2024, the Plaintiffs along with Cardinale sent Feingold and Dazzo a letter demanding the return of the stolen money to no avail. See **Exhibit K**.

**WHEREFORE**, the L3 Funds and L3 Investors demand judgment in their favor and against Feingold and Dazzo granting all damages including, but not limited to, treble damages, interest, attorneys' fees and court costs pursuant to Florida Statute § 772.11 and any other available relief under applicable law.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request the Court to enter an order in their favor against Defendants for damages consisting of the following (some of which may overlap and so may at this time be requested in the alternative):

a.     Compensatory damages in an amount to be determined at trial but believed to be in excess of **$150 million**;

b.     Treble damages pursuant to 18 U.S.C. § 1964(c) and Florida Statute § 772.11;

c.     Punitive damages;

d.     Rescission and rescissionary damages;

e.     Attorney's fees pursuant to 18 U.S.C. § 1964(c) and Florida Statute § 772.11;

f.     Pre- and post-judgment interest where appliable;

g.     For interest to run until the date that the award is fully paid and satisfied by

71

Defendants;

h.     Costs, including experts' fees, and other expenses incurred in connection with this

action; and

i.     Such other and further relief as the Court deems appropriate.


## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.


Date: June 9, 2025

Respectfully Submitted,

**EPPERSON & GREENIDGE, P.A.**
20 South Olive Street, Suite 304
Media, Pennsylvania 19063
T. 877.445.9261

*/s/ Andrew M. Greenidge          ----*
**ANDREW M. GREENIDGE, ESQ.**
Fla. Bar No. 0016581
service@eppersongreenidge.com

*Counsel for Plaintiffs*

**RULE 23.1 VERIFICATION**

I, ANTHONY SIRIANI, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this __7th__ day of __May__ 2025.

Print Name:   ANTHONY SIRIANI

## RULE 23.1 VERIFICATION

I, LORI SIRIANI, am a named Plaintiff to this action. I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___7___ day of ___May___ 2025.

Print Name: LORI SIRIANI

## RULE 23.1 VERIFICATION

I, JOSEPH ANTONAKOS, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _15_ day of _May_ 2025.

Print Name: JOSEPH ANTONAKOS

## RULE 23.1 VERIFICATION

I, GRACE CICCONE, individually and as Executrix of the Estate of Dr. Patrick Ciccone, am a named Plaintiff to this action. I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this __6__ day of __June__ 2025.

_____
Print Name:   GRACE CICCONE
individually and as Executrix of the
Estate of Dr. Patrick Ciccone

## RULE 23.1 VERIFICATION

I, KATE FAUNTLEROY, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this __5th__ day of _____May_____ 2025.


_/s/ Kate Fauntleroy_____

Print Name:    KATE FAUNTLEROY

## RULE 23.1 VERIFICATION

I, PERRY HARRIS, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the  L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein relating to me and about which I have personal knowledge are true and accurate to the best of my personal knowledge and based on review of documents and information in my possession.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 15TH day of ___MAY___ 2025.

Print Name:    PERRY HARRIS

## RULE 23.1 VERIFICATION

I, LEROY HOWE, am a named Plaintiff to this action. I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _14 TH_ day of ___MAY___ 2025.

Print Name: LEROY HOWE

## RULE 23.1 VERIFICATION

I, DAVID KNOX, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND and the L3 CAPITAL HOTEL FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this __7th__ day of __May__ 2025.

_David G Knox_
Print Name:   DAVID KNOX

## RULE 23.1 VERIFICATION

I, RICHARD KRAMER, am a named Plaintiff to this action. I am a member of the L3 CAPITAL INCOME FUND and the L3 CAPITAL HOTEL FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 13ᵗʰ day of May 2025.

Richard Kramer

Print Name:   RICHARD KRAMER

**RULE 23.1 VERIFICATION**

I, DR. GREGORY LOVALLO, am a named Plaintiff to this action.  I am a member of the

L3 CAPITAL INCOME FUND and the L3 CAPITAL HOTEL FUND, and have been at all times

throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the

allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated

therein about which I have personal knowledge are true, and the other matters stated therein are

true and accurate to the best of my knowledge, information and belief, based in part upon the

investigation conducted by counsel.  Having received a copy of this Complaint, having reviewed

it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed this __14th_ day of ____May_____ 2025.


_/s/ Gregory Lovallo_
_____
Print Name:    DR. GREGORY LOVALLO

## RULE 23.1 VERIFICATION

I, WILLIAM JOSEPH MORONEY, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND, the L3 CAPITAL HOTEL FUND and the L3 CAPITAL SPECIAL OPPORTUNITY FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this __7th__ day of _____May_____ 2025.


_____*/s/ William Joseph Moroney*_____

Print Name:    WILLIAM JOSEPH MORONEY

## RULE 23.1 VERIFICATION

I, DR. ROBERT SIMON, am a named Plaintiff to this action. I am a member of the L3 CAPITAL INCOME FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein about which I have personal knowledge are true, and the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___14___ day of ___MAY___ 2025.

Print Name:    DR. ROBERT SIMON

**RULE 23.1 VERIFICATION**

I, DR. VINCENT LANTERI, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND and the L3 CAPITAL HOTEL FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein relating to me and about which I have personal knowledge are true and accurate to the best of my personal knowledge and based on review of documents and information in my possession.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _14th_ day of __May_____ 2025.


_____/s/ Vincent Lanteri_____
Print Name: DR. VINCENT LANTERI

## RULE 23.1 VERIFICATION

I, DR. MICHAEL WASSERMAN, am a named Plaintiff to this action.  I am a member of the L3 CAPITAL INCOME FUND and the L3 CAPITAL HOTEL FUND, and have been at all times throughout the Relevant Period and approve the filing of this Complaint.  I have reviewed the allegations made in this VERIFIED DERIVATIVE COMPLAINT and state that the matters stated therein relating to me and about which I have personal knowledge are true and accurate to the best of my personal knowledge and based on review of documents and information in my possession.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this __14__ day of ___May_____ 2025.


_____/s/ Michael Wasserman_____
Print Name: DR. MICHAEL WASSERMAN